ORAL ARGUMENT NOT YET SCHEDULED
CASE NOS. 22-1312, 23-1015
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

GHG MANAGEMENT LLC, D/B/A WINDY CITY CANNABIS, D/B/A
CURALEAF WEED STREET,

Petitioner/Cross-Respondent,

vs.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner

_____

ON PETITION FOR REVIEW
FROM ORDER OF THE NATIONAL LABOR RELATIONS BOARD
372 NLRB No. 13 (Dec. 5, 2022)

_____

**INITIAL BRIEF OF PETITIONER**
**(DEFERRED APPENDIX)**

_____

Maurice Baskin
Stefan Marculewicz
Littler Mendelson, PC
815 Connecticut Ave, N.W., Ste. 400
Washington, D.C. 20006
T: (202) 842-3400
F: (202) 842-0011
mbaskin@littler.com
smarculewicz@littler.com

*Attorneys for Petitioner GHG*
*Management LLC*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner GHG Management LLC d/b/a Windy City Cannabis d/b/a Curaleaf Weed Street ("Petitioner" or "Curaleaf"), hereby makes the following Corporate Disclosure Statement:

(1)    Petitioner's parent corporation is GR Companies, Inc.;

(2)    Curaleaf, Inc. is the sole shareholder of Petitioner's parent corporation;

(3)    Curaleaf, Inc. is a publicly traded company that indirectly owns 10% or more of Petitioner's stock; and

(4)    Petitioner is a medical and recreational cannabis company.

*/s/Maurice Baskin*

Maurice Baskin

## PETITIONER'S CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES

**A.    Parties and Amici.**

1.    Curaleaf is the Petitioner and Cross-Respondent.

2.    The National Labor Relations Board ("Board" or "NLRB") is the Respondent and Cross-Applicant for Enforcement.

i

3. United Food & Commercial Workers Local 881 (the "Union") was the Charging Party in the underlying proceedings before the NLRB.

**B.    Rulings Under Review.**

Curaleaf seeks review of the Decision and Order of the Board issued against Curaleaf on December 5, 2022, reported at 371 NLRB No. 163 in NLRB Case No. 13-CA-295623, which is captioned as *GHG Management LLC d/b/a Windy City Cannabis d/b/a Curaleaf Weed Street and United Food & Commercial Workers Local 881.* That Decision incorporated by reference the Board's Decision on Review and Order in Case No. 13-RC-271360, published at 371 NLRB No. 93, which affirmed the Regional Director's Decision and Certification of Representative on April 21, 2022.

**C.    Related Cases.**

Curaleaf is aware of no related cases before this or any other court.

*/s/ Maurice Baskin*
Maurice Baskin

ii

# **TABLE OF CONTENTS**

JURISDICTION...................................................................................1

ISSUES PRESENTED.........................................................................2

RELEVANT STATUTES AND REGULATIONS..................................3

STATEMENT OF THE CASE..............................................................3

    Procedural History .......................................................................3

    The Record Evidence..................................................................6

    The Hearing Officer's Report....................................................12

    The Regional Director's Decision and Certification of Representative............16

    The Board's Decision on Review..............................................17

    Subsequent Proceedings ...........................................................19

SUMMARY OF ARGUMENT ............................................................20

STANDING .........................................................................................21

STANDARD OF REVIEW ..................................................................22

ARGUMENT .......................................................................................24

    A.  The Region's Misrepresentation and Other Irregularities Impairing the Legal Rights of the Parties Were Plainly the Type of Misconduct That Warranted Setting Aside the Election ...............................................24

    B.  The Region's Conduct in Processing Ms. Wratten's Duplicate Ballot Kit Caused Delays With Ms. Wratten's Ballot That Establish Possible Disenfranchisement ...........................................................33

    C.  General Delays With The USPS Should Invalidate The Election..............39

    D.  The Region's Failure To Issue An Amended Notice Of Election Either Invalidated The Election *Per Se* Or Possibly Resulted In Disenfranchisement41

    E.  The Board's Failure to Enforce the Employer's and Union's Request to the General Counsel To Subpoena Pertinent Testimony and Documents Further Justifies Granting The Petition For Review ...................................47

CONCLUSION ....................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABM Onsite-Servs.-West, Inc. v. NLRB*,
  849 F.3d 1137 (D.C. Cir. 2017)..........................................................................22

*Allentown Mack Sales and Svc., Inc. v. NLRB*,
  522 U.S. 359 (1998)............................................................................................22

*Aspirus Keweenaw*,
  370 NLRB No. 45 (2020) .......................................................................33, 39, 40

*Athbro Precision Engineering Corp.*,
  166 NLRB 966 (1967), *vacated on other grounds*, 171 NLRB 121
  (1968)...................................................................................................30, 31, 32

*Austill Waxed Paper Co.*,
  169 NLRB 1109 (1968) .......................................................................................31

*Avante at Boca Raton*,
  323 NLRB 555 (1997) .........................................................................................35

*Boire v. Greyhound Corp.*,
  376 U.S. 473 (1964).......................................................................................1, 19

*Circus Circus Casinos, Inc. v. NLRB*,
  961 F.3d 469 (D.C. Cir. 2020)............................................................................23

*Cleveland Constr., Inc. v. NLRB*,
  44 F.3d 1010 (D.C. Cir. 1995)............................................................................22

*Concrete Express of New York*, LLC,
  368 NLRB No. 135 (2019) ..................................................................................31

*Davis & Newcomer Elevator Co.*,
  315 NLRB 715 (1994)....................................................................................24, 44

*Dupuy v. NLRB*,
    806 F.3d 556 (D.C. Cir. 2015)..............................................................23

*Everport Terminal Servs. v. NLRB*,
    47 F.4th 782 (D.C. Cir. 2022)..............................................................23

*Garda World Security Corp.*,
    356 NLRB 594 (2011) ....................................................24, 27, 28, 29

*Guardsmark, LLC*,
    363 NLRB 931 (2016) ............................................................27, 28, 29

*Honeywell Int'l, Inc. v. NLRB*,
    253 F.3d 119 (D.C. Cir. 2001)..............................................................23

*Int'l Trans. Svc., Inc. v. NLRB*,
    449 F.3d 160 (D.C. Cir. 2006)..............................................................22

*Jakel Inc.*,
    293 NLRB 615 (1989) ....................................................................31, 32

*Laidlaw Transit, Inc.*,
    327 NLRB 315 (1999) ...........................................................................47

*Lemco Construction, Inc.*,
    283 NLRB 459 (1987) ....................................................................35, 39

*National Hot Rod Association v. NLRB*,
    988 F.3d 506 (D.C. Cir. 2021)............................. 20, 23, 25, 26, 28, 45

*National Van Lines*,
    120 NLRB 1343 (1956) .........................................................................38

*North American Aviation, Inc.*,
    81 NLRB 1046 (1949) ...........................................................................24

*Oneida County Community Action Agency, Inc.*,
    317 NLRB 852 (1995) ...........................................................................24

*Pac. Micronesia Corp. v. NLRB*,
    219 F.3d 661 (D.C. Cir. 2000)..............................................................22

*Paprikas Fono*,
273 NLRB 1326 (1984) ...................................................................31

*Polymers, Inc.*,
174 NLRB 282 (1969), *enfd.* 414 F.2d 999 (2d Cir. 1969) ...............35

*Rattan Art Gallery, Ltd.*,
260 NLRB 255 (1982) ...................................................................45

*Sitka Sound Seafoods, Inc. v. NLRB*,
206 F.3d 1175 (D.C. Cir. 1999) ......................................................44

*Star Baking Co.*,
119 NLRB 835 (1957) ...................................................................24

*Sutter E. Bay Hosps. v. NLRB*,
687 F.3d 424 (D.C. Cir. 2012) ........................................................23

*Titanium Metals Corp. v. NLRB*,
392 F.3d 439 (D.C. Cir. 2004) ........................................................23

*Tramont Mfg., LLC v. NLRB*,
890 F.3d 1114 (D.C. Cir. 2018) ......................................................23

*Walker Vehicle Co.*,
7 NLRB 827 (1938) .......................................................................45

*Waste Management of Northwest Louisiana*,
326 NLRB 1389 (1998) .................................................................38

*Wolverine Dispatch, Inc.*,
321 NLRB 796 (1996) ..........................................24, 26, 27, 28, 29

*In Re Woods Quality Cabinetry Co.*,
340 NLRB 1355 (2003) .................................................................45

**Statutes**

29 U.S.C. § 152(2) .........................................................................21

29 U.S.C. §§ 158(a)(5) and (1) .........................................................2

29 U.S.C. § 159(a) ..................................................................21, 40

29 U.S.C. § 160(e) ........................................................................2

29 U.S.C. § 160(f) ........................................................................2

National Labor Relations Act ................................. 1, 2, 3, 19, 21, 22, 41

Administrative Procedure Act ..............................................................22

**Other Authorities**

29 C.F.R § 102.62(e) ................................................................42, 43

29 C.F.R. §§ 102.62(e) and 102.67(k) ................................................3, 43

29 C.F.R § 102.67(k) ................................................................42, 43

29 C.F.R § 102.118 ....................................................................4, 47

Rule 28(a)(5) ........................................... 3, 4, 6, 7, 8, 9, 10, 11, 12

Casehandling Manual Section 11336.4 ..............................................36, 44

## <u>GLOSSARY</u>

APA:          Administrative Procedure Act

Dec.:         Decision

JA:           Deferred Joint Appendix

NLRA or Act:       National Labor Relations Act

NLRB or Board:       National Labor Relations Board

Union:       United Food and Commercial Workers Local 881

ARD:          Acting Regional Director:

Tr:           Transcript of hearing on objections to election

# I.    JURISDICTION

The Board had subject matter jurisdiction over this case under Sections 8 and 9 of the National Labor Relations Act (the "Act"), 29 U.S.C. 158 and 159. Pursuant to Section 9, in response to a petition for election filed by the Union (Case No. 13-RC-271360), the Board's Regional Director conducted an election to determine whether Product Specialists employed by Curaleaf wished to be represented for purposes of collective bargaining by the Union. **The Union prevailed in the election by a single vote.** After overruling objections to the conduct of the election filed by Curaleaf, the Acting Regional Director certified the Union as the representative of Curaleaf's employees. The Board denied Curaleaf's request for review pursuant to Section 9 of the Act and affirmed the Acting Regional Director's Decision and Certification of Representative on April 21, 2022.

Because the Board's representation decisions are not "final orders," such decisions can be challenged only by testing the certification in a refusal to bargain proceeding.  *See Boire v. Greyhound Corp.*, 376 U.S. 473 (1964). Accordingly, Curaleaf refused to recognize or bargain with the Union. On May 11, 2022, the Union filed an unfair labor practice charge (Case No. 13-CA-295623). After issuance of a complaint by the Regional Director and transfer of proceedings to the Board, the Board issued a final Decision and Order on December 5, 2022, reaffirming its certification of the Union and on that basis finding that Curaleaf had

1

violated sections 8(a)(5) and (1) of the National Labor Relations Act, as amended, ("Act"), 29 U.S.C. §§ 158(a)(5) and (1).  The Board ordered that Curaleaf recognize and bargain with the Union, and it ordered certain other relief.

Curaleaf, as an aggrieved party, filed its petition for review in this Court on December 9, 2022, pursuant to section 10(f) of the Act, 29 U.S.C. § 160(f).  The Board's Decision and Order is a "final" order, and this Court has jurisdiction pursuant to 29 U.S.C. § 160(f).  The Act specifies no time period for filing a petition for review or enforcement.  The Board subsequently filed a cross-petition seeking enforcement of its order pursuant to 29 U.S.C. § 160(e).

## II.    ISSUES PRESENTED

1.    Whether the record affirmatively establishes "irregularities" in the Regional Office's conducting of this mail-ballot election, which resulted in the possible disenfranchisement of a determinative number of eligible voters, and which required the Board, under its established precedents, to set aside the underlying representation election and direct a new election?

2.    Whether the record affirmatively establishes conduct that "tends to destroy confidence in the Board's election process, or could reasonably be interpreted as impairing the election standards the Board seeks to maintain", under its established precedents, to set aside the underlying representation election?

3.      Whether the record affirmatively establishes that voters were "prevented from voting . . . by unfairness in the scheduling or mechanics of the election", under the Board's established precedents, to set aside the underlying representation election and direct a new election?

4.      Whether 29 C.F.R. §§ 102.62(e) and 102.67(k) require a Regional Director to issue an Amended Notice of Election following the change in the date and time of a stipulated or directed election?

### III.    RELEVANT STATUTES AND REGULATIONS

Pertinent sections of the Act, the regulations implementing the Act, and the APA appear in a Statutory Addendum attached to the end of this brief, consistent with Circuit Rule 28(a)(5).

### IV.    STATEMENT OF THE CASE

#### A.    Procedural History

This matter arises out of a Petition filed by the Petitioner, United Food and Commercial Workers Local 881, on January 11, 2021.  (JA__; Hr'g Off. Rep. at 2.) The Parties entered into a Stipulated Election Agreement for a mail ballot election for the Employer's Product Specialists employed at the Employer's location at 923 W. Weed Street in Chicago, Illinois.  (*Id.*)  The Stipulated Election Agreement called for mail ballot kits to be mailed to eligible voters on February 25 at 5:00 p.m. Central Standard Time.  (*Id.*)  The ballots were to be received by the Region by the close of

business on Friday, March 19 and were to be counted, via videoconference, at 10:00 a.m. on Monday, March 22.  (*Id.*)

During the pendency of the mail ballot period, on about March 18, the Board agent handling the election separately contacted the Parties and informed them that a certain number of voters had indicated to the Region that they had returned ballots, but that those ballots had not been received by the Region.  As a result, the Board agent informed the Parties that the ballot count scheduled for March 22 would need to be postponed to March 31.[1]  Following the conversation with the Board agent, based on her representations, counsel for the Employer and Union executed a stipulation postponing the ballot count to March 31.  (JA__; *Id.* at 5; Jt. Exs. 4a, 4b.)  As a result of the Parties' stipulation, the Region ordered that that the ballot count be postponed to March 31.  (JA__; Hr'g Off. Rep. at 5; Jt. Ex 5.)  The ballot count was held on March 31.  (JA__; Hr'g Off. Rep. at 6.)  The tally of ballots reflects 11 ballots cast in favor of representation by Petitioner and 10 ballots cast against representation by Petitioner.  (JA__; *Id.* at 2.)

---

[1] Despite requesting issuance of a subpoena for the Board agent involved in this matter under 29 C.F.R. § 102.118, the General Counsel denied Curaleaf's request. As the Board agent was not permitted to testify, there is no evidence in the record regarding these interactions although the interactions are clearly supported by the stipulation entered into following these interactions.  To the extent this is material, it demonstrates the Board's error in silently affirming the denial of testimony under 29 C.F.R. § 102.118.

Following the ballot count, on April 7, 2021, the Employer filed five Objections to the conduct of the election:

> **OBJECTION 1:**  The accuracy and purpose of the mail ballot election was defeated by delays with the National Labor Relations Board processing of ballots and extraordinary and arbitrary delays with the United States Postal Service which resulted in voter disenfranchisement that is outcome determinative.

> **OBJECTION 2:**  After postponing the ballot count on or about March 18, 2021 because of known outstanding ballots from voters that had not yet been received by the Region, and then representing to the parties on March 22 that it had received ballots from all voters that told the Region they had returned ballots, the Board Agent failed to notify the parties that the Region was aware that at least one voter had returned a ballot but it had not been received by the Region as of the ballot count on March 31 resulting in the disenfranchisement that is outcome determinative.

> **OBJECTION 3:**  The Board Agent engaged in misconduct by arbitrarily and/or selectively contacting certain voters, but not all voters, to confirm whether they had received a ballot and/or had returned their ballot resulting in disparate treatment of voters and/or disenfranchisement that is outcome determinative.[2]

> **OBJECTION 4:**  On or about March 18, 2021, the Board Agent contacted the Employer's attorney and explained that the ballot count would be postponed to March 31 regardless of whether the Employer stipulated to the new date.  The Region's decision to unilaterally force postponement of the count to March 31 was objectionable.

> **OBJECTION 5:**  Following forced postponement of the count, the Region failed to issue a new notice of election updating employees

---

[2] Curaleaf does not pursue Objection 3 before this Court.

regarding the new count date resulting in insufficient notice to employees.

(JA__; ARD Dec. at 2.)  A video hearing on the Objections was held on April 28 via Zoom in front of Hearing Officer Matthew Ritzman.

### B.    The Record Evidence

**<u>Objections 1, 2, and 4</u>**

Ultimately, the mail ballot union representation election held in February and March 2021 resulted in eleven (11) votes cast in favor of representation, ten (10) votes cast against representation, and eight (8) eligible voters not casting a ballot. (JA__; Hr'g Off. Rep. at 2.)  It was a one vote margin election.  Mail ballots were mailed to voters on February 25 and were due back to the Region to be counted on or by March 22.  (*Id.*)

**<u>Voter Lisa Wratten</u>**

Following the mailing of ballots on February 25, voter Lisa Wratten did not receive a mail ballot from the Region.  (JA__; *Id.* at 4.)  As Ms. Wratten testified, she did not receive a ballot because she had recently moved and changed addresses. (*Id.*)  Around March 3 or March 4, Ms. Wratten attempted to contact the Region to request a duplicate ballot.  (*Id.*)  Despite calling the numbers listed on the Notice of Election posted in the workplace on multiple occasions, Ms. Wratten was unable to speak directly with anyone at the Region to request a new ballot kit.  (*Id.*)  Ms.

Wratten left a voicemail with the Region requesting a new ballot kit on Thursday, March 4. (*Id.*) Despite leaving a voicemail message on March 4, and despite having no other contact with the Region, Ms. Wratten was not mailed a duplicate ballot kit until March 10. (JA__; *Id.* at 5.)

After the Region mailed Ms. Wratten's duplicate mail ballot kit on March 10, the Board agent communicated via text message with Ms. Wratten regarding the status of her mail ballot on March 15. Specifically, on that day, the Board agent sent a text message to Ms. Wratten asking, "Hi Lisa, Had you received your duplicate ballot? We received your original one from the USPS as attempted not known unable to forward." (JA__; Er. Ex. 5.) Ms. Wratten testified that on March 15, she received the ballot kit in the mail. (JA__; Hr'g Off. Rep. at 5.) The following day, on March 16, Ms. Wratten responded via text message to the Board agent, "Yes I got my duplicate and am sending it out todRFRay! Thank you for your help[.]" (JA__; Er. Ex. 1.) On March 18, Ms. Wratten placed her mail ballot in the mail in the mailbox at her apartment in Chicago, Illinois. (JA__; Hr'g Off. Rep. at 5.)

On March 18, the Board agent separately contacted the Parties and indicated to the Parties that a certain number of voters had told the Region they had returned ballots, but that those ballots had not been received by the Region. There is no dispute that, as of this date, the Region was under the impression that Ms. Wratten's ballot had been mailed and the Region had not received Ms. Wratten's ballot. As a

7

result of Ms. Wratten's ballot and others, the Board agent informed the Parties that the ballot count scheduled for March 22, would need to be postponed to March 31. When this was relayed, the Board agent offered the proposition as a "fait accompli"—if the Parties did not agree to postponement of the ballot count, the Region would act to postpone the ballot count unilaterally.[3]  (JA__; Id. at 5) (citing Employer's offer of proof as to a fait accompli.)

Following the conversation with the Board agent, based on her representations, counsel for the Petitioner and Employer executed a stipulation postponing the ballot count to March 31.  (JA__; Jt. Exs. 4a, 4b.)  As indicated in the Parties' stipulation, the reason for the postponement of the ballot count was that, "[t]here is a concern that not all mail ballots mailed back to the Regional Office have been received." (*Id.*)  As a result of the Parties' stipulation, the Region Ordered that that the ballot count be postponed to March 31.  (JA__; Jt. Ex. 5.)  The Order specifically referenced that the ballot count was being postponed because, "[t]he Regional Office has experienced intermittent delays in mail delivery by the United

---

[3] The Employer requested consent from the General Counsel for testimony from the Board agent.  The request for testimony was denied.  To the extent it is material, the denial of testimony from the Board agent prejudiced the Employer in numerous respects, including to the extent that the Board agent would have provided factual testimony related to her conversations with counsel from both Parties.

States Postal Service and as there is a concern that not all ballots mailed back to the Regional Office have been received." (*Id.*)

The Monday following the stipulation to extend the count because of the Region's belief that ballots had been mailed but not received, the Board agent emailed counsel for the Parties:

> Happy Monday! Wanted to let you both know that the 3 ballots I had been expecting plus a couple more came in to our office late Friday. **So we've received ballots from all at least that have told me that they sent their ballots in.** We are at about 20 received as of this past Friday. Thus, I'd expect we'll be going forward with the count on 3/31. (JA__; Hr'g Off. Rep. at 6) (emphasis added.)

The Board agent's representation was not correct. As of March 22, the Region had not received Ms. Wratten's ballot. (*Id.*) This misrepresentation was not corrected as of the ballot count on March 31, 2021. The union prevailed at the count by one vote, 11-10.

Immediately following the Board agent's transmission of the Tally of Ballots, on March 31, 2021, counsel for Curaleaf sent an email to the Board agent explaining Curaleaf's general belief, based on turnout, that there may have been ballots that were mailed but not received by the Region:

> Thank you for sending this. Given the count, there is a possibility that delays with the USPS affected the outcome of the election. As it may be relevant to potential objection filings, the Company requests that the Region preserve any ballot envelopes received after your trip to the Region this morning. The Company further requests that the

9

NLRB notify the parties if additional ballot envelopes in this matter are received." (*Id.*)

The Board agent immediately responded, affirming that the Region would inform counsel of any late received ballots. Once again, the Board agent did not accurately relay the facts:

> My office will inform me of any ballots should they come in. If there are any ballots received by our office after the count this morning, I will advise you both. **As you both know, as of Thursday 3/18 before the original count scheduled on 3/22, there were 3 voters that had separately informed me they mailed their ballot but we had not received them at my office.  That led us to reschedule the count. Those 3 voters' ballots were then received the following day, on Friday 3/19.  Thus, we received a ballot from each voter that had contacted me.** I will be in touch if we receive additional ballots.

(*Id.*) (emphasis added.)  The Board agent's representation again failed to account for her knowledge of Ms. Wratten's outstanding mail ballot.

On April 2, the Board agent informed the Parties that the Region received Ms. Wratten's ballot on April 1.  The Board agent then attempted to qualify her prior objective misrepresentation to the Parties:

> We received Lisa Wratten's duplicate mail ballot at our office yesterday afternoon.  It was postmarked March 18. We sent the duplicate on March 10 per Ms. Wratten's request as she said she had a different address than what was on the voter's list.  **While she contacted me to request the duplicate, she did not request that I confirm we received her ballot, so she was not "on my radar" to contact upon receiving her ballot.  In any event, I'd like to clarify my statement below, "we received a ballot from each voter that had contacted me," such that we received a ballot from those that contacted me to ask that I confirm when their ballot has been**

10

> **received by my office.** Of the remaining voters whose ballots we have
> not received (I believe there are 8), I did not receive any contact from
> them to request a duplicate ballot or otherwise concerning this election.
> In the meantime, I'll let you know if any other ballots come in.

(*Id.*) (emphasis added.) The Board agent's qualification was an entirely different representation than the representation she made on March 22. Inspection of Ms. Wratten's ballot at the hearing indicated that Ms. Wratten's signed yellow ballot envelope was received by the Region on April 1. (*Id.*)

### Voter Anna Kaplan

Beyond evidence pertaining to Ms. Wratten's ballot, eligible voter Anna Kaplan also mailed a ballot in the underlying election, but that ballot was never received by the Region. Ms. Kaplan testified that that she received her ballot on or about March 5 and mailed it on March 8. (JA__; *Id.* at 4.) As of the date of the hearing, on April 28, the Region had not received Ms. Kaplan's ballot.[4] (*Id.*)

### Voter Jonathan Coffman

Corroborating the fact that Ms. Kaplan actually mailed her ballot to the NLRB but it remains lost in the mail, eligible voter Jonathan Coffman testified that, despite his address being listed correctly on the voter list, Mr. Coffman never received a ballot kit from the NLRB. (*Id.*)

### Objection 5

---

[4] Presumably, Ms. Kaplan's ballot remains lost as the Region has not contacted counsel regarding Ms. Kaplan's ballot.

Following the approval of the Stipulated Election Agreement, the Region issued a Notice of Election containing the details of the election indicating that the ballots would be mailed on February 25 and counted March 22 at 10:00 a.m. (JA__; Hr'g Off. Rep. at 14.) This was the only Notice of Election issued by the Region in this matter. (*Id.*)

### C.      The Hearing Officer's Report

On June 25, the Hearing Officer issued his Report on the Objections, recommending that all five of the Employer's Objections be overruled.

### <u>Objection 1</u>

In overruling Objection 1, pertaining to delays with the Board's processing of mail ballots and unreasonable and arbitrary delays with the United States Postal Service, the Hearing Officer's Report found that Wratten—but not the Board—was responsible for the late arriving ballot. (JA__; Hr'g Off. Rep. at 8-9.) In reaching this conclusion, the Hearing Officer first blamed Wratten for not updating Curaleaf on her new address. (JA__; *Id.* at 8.) The Hearing Officer then blamed Wratten for the Region not processing her duplicate ballot between March 4 and March 10, claiming that although she left a voicemail on March 4, there was no evidence that Wratten included her new mailing address in her voicemail. (*Id.*) With only

12

attempted contact between Wratten and the Region between March 4 and March 10, the Region mailed Ms. Wratten's duplicate ballot on March 10.  (JA__; *Id.* at 8-9.)

The Hearing Officer then went on to deny any objection related to the USPS (in the form of Wratten's 14-day mailing time, the lost ballot of Kaplan, and lost ballot kit of Coffman), chalking it up to the "vagaries of mail delivery".  (JA__; *Id.* at 9.)  This despite the fact that record evidence demonstrated that 3 of 29 voters[5]—more than 10 percent of all eligible voters—had ballots impacted by problems with USPS processing of mail.

**<u>Objection 2</u>**

With regard to the misrepresentation objection, the Hearing Officer's Report rejected Petitioner's claim both factually and legally, making a number of unsupported assertions:

1. "The Employer does not specifically allege Board agent conduct as the basis for Objection 2.  Instead, the Employer raised such argument in its brief."  (JA__; *Id.* at 11.)

2. That the Board agent did not misrepresent the status of outstanding ballots because Ms. Wratten told the Board agent she was mailing her

---

[5] 31 voters were mailed ballot kits, 29 of these 31 were eligible voters.

ballot that day, on March 16, but did not actually mail it until March 18.  (JA__; *Id.* at 12.)

3.  Faulting the Parties for not requesting clarification of the Board agent's March 22 misrepresentation, "[t]he record does not establish that either party requested additional information or clarification from the Board agent between the March 22 email and the March 31 ballot count regarding any outstanding ballots."  (JA__; *Id.* at 11.)

4.  That the Board agent's post-election "clarification" e-mail resolved the Board agent's March 22 misrepresentation, "[t]he Board agent offered an explanation to the parties in the April 2 email that explains that Wratten did contact the Region 13 office to request a duplicate ballot, but did not request that Region 13 personnel confirm if or when it received Wratten's ballot.  The Board agent explained that the March 22 statement that the Region 'had received a ballot from each voter that had contacted me,' was intended to mean that the Region had received a ballot from those that contacted the Board agent to ask that the Region additionally confirm when their ballot had been received.   In consideration of the Board agent's asserted explanation to the parties, none of the three witnesses—including Wratten—testified that they

14

requested that Region 13 personnel confirm if or when the ballot was received in the Region 13 office." (*Id.*)

5. That the Board agent did not misrepresent the status of outstanding ballots because Ms. Wratten indicated that she was *going to* mail it out that day as opposed to her telling the Board agent she *had* sent it. (JA__; *Id.* at 12.)

6. That the Employer is not entitled to relief because "[t]he record does not show that either party actually requested or was denied a second postponement of the ballot count to allow for additional ballots to arrive at the Regional office" and, therefore, any harm is speculative. (*Id.*)

**Objection 4**

The Hearing Officer recommended that Objection 4 be overruled reasoning that (1) there is no record evidence that the Region forced the postponement of the March 22 count and (2) the Stipulated Election Agreement gave the Regional Director discretion to reschedule, in his or her discretion, the date, time, and place of the election and/or count. (JA__; *Id.* at 13-14.)

**Objection 5**

The Hearing Officer recommended that that Objection 5—the failure to issue a new notice of election—be overruled, concluding that "there is insufficient

evidence that the alleged irregularity raised a reasonable doubt as to the fairness and validity of the election." (JA__; *Id.* at 14-15.)

### D. The Regional Director's Decision and Certification of Representative

In the wake of the Hearing Officer's Report, the Employer filed timely exceptions as to all five Objections and the ARD issued his Decision and Certification of Representative on August 5, 2021. (JA__; ARD Dec. at 1.) The ARD affirmed the decision of the Hearing Officer with only minor modifications.

#### <u>Objection 1</u>

In overruling the Employer's Objection pertaining to Board delay, the ARD relied upon two key conclusions: (1) there was no evidence that Ms. Wratten left a voicemail and requested a duplicate ballot, and (2) that it was Ms. Wratten's delay, not the Region's, that caused her ballot to be late. (JA__; *Id.* at 2-6.)

#### <u>Objection 2</u>

The ARD's decision overruling the misrepresentation objection was premised on three grounds. First, the ARD denied that the Board agent's March 22 email statement was a misrepresentation, instead calling it "more of a misunderstanding than a misrepresentation." (JA__; *Id.* at 7.) Second, the ARD overruled the objection because the "confusing statements to the parties had no impact on voter's

16

choice or the mechanics of the election". (*Id.*) Third, the ARD found that the harm from the misrepresentation was entirely speculative. (*Id.*)

### **Objection 4**

As to Objection 4, the ARD overruled the Objection reasoning that (1) there is no record evidence that the Region forced the postponement of the March 22 count and (2) the Stipulated Election Agreement gave the Regional Director discretion to reschedule, in his or her discretion, the date, time, and place of the election and/or count. (JA__; *Id.* at 8-9.)

### **Objection 5**

Objection 5 addresses the Region's failure to issue an amended Notice of Election accurately reflecting the alteration of the date and time of the ballot count. The ARD overruled the Employer's objection finding that nothing in the Board's Rules and Regulations or procedures required the Region to issue an amended notice of election and because the alleged harm was speculative. (JA__; *Id.* at 9-10.)

### E.    The Board's Decision on Review

Following the Regional Director's Decision and Certification of Representative, Curaleaf timely filed a Request for Review of the Regional Director's Decision seeking review of all five objections.

The Board granted review solely with regard to Objection 2. (JA__; 371 NLRB No. 93 at 1). In altering but affirming the analysis of the ARD, in a 2-1

decision, the Board (1) incorrectly heightened the standard for setting aside elections for Board agent conduct to require actual prejudice as opposed to *possible* impact on the election, (2) as a complete non-sequitur, concluded that because Wratten had mailed her ballot prior to the misrepresentation, the misrepresentation could not have had any impact on the outcome of the election, and (3) that any harm was speculative because there was no obligation for the ARD to grant a second extension of the count.  (JA__; 371 NLRB No. 93 at 2.)

In applying the "procedural irregularity" line of cases, the Board expressly disclaimed that this case involves conduct that "tends to destroy confidence in the Board's election process, or could reasonably be interpreted as impairing the election standards the Board seeks to maintain." (*Id.*)  Central to this conclusion, the Board explained that it "would not find that an alleged misrepresentation concerning the status of a single outstanding ballot tends to destroy confidence in the overall election process." (*Id.*)

In his dissent, Member Kaplan expressed the view that "Employer's objections raise insurmountable concerns about the Region's handling of this mail-ballot election, the outcome of which turned on a single vote."  (JA__; 371 NLRB No. 93 at 2 n.7.)  In particular, Member Kaplan noted "a substantial issue regarding the effect of the Board agent's failure to inform the parties about the status of Wratten's ballot" and "[t]he Region's inconsistent handling of ballots—postponing

18

the count out of concern for outstanding ballots, but then, by its misstatement, precluding any opportunity to request a second postponement where that concern still existed—undermin[ing] the integrity of the election process." (*Id.*). For these reasons, "[t]aken with the other potential election irregularities raised by the Employer, Member Kaplan finds the collective effect on the election of all issues raised in the Request for Review require that the election results be set aside and a new election ordered." (*Id.*).

### F.    Subsequent Proceedings

Thereafter, Curaleaf refused to recognize or bargain with the Union, as was required in order to test the Board's certification. *See Boire v. Greyhound Corp.*, 376 U.S. at 473. The Union filed an unfair labor practice charge, which resulted in the issuance of a Complaint against Curaleaf. (JA___; Complaint.) Because the Union had previously been certified by the Board, the General Counsel filed a motion for summary judgment, which the Board granted in its April 21, 2022 Decision and Order finding that Curaleaf had violated sections 8(a)(5) and (1) of the Act. (JA___; Board Dec.) Curaleaf filed its petition for review in this Court on December 9, 2022. The Board subsequently filed a cross-petition seeking enforcement of its order.

19

## V.    SUMMARY OF ARGUMENT

This case involves an improper attempt by the National Labor Relations Board to insulate itself from scrutiny over its highly irregular conduct during a mail ballot election.  The Board's certification of the Union election in this case assumed and did not otherwise dispute that its Regional office misrepresented critical facts to the parties – thereby impairing the parties' legal decision-making abilities – but that such impairment was inconsequential because the harm created by its misrepresentation was "speculative".  But the Board's own precedents, reaffirmed by this Court's recent holding in *National Hot Rod Association v. NLRB*, 988 F.3d 506 (D.C. Cir. 2021), establish that the test for certifying an election is whether it was *possible* for a Board irregularity to have caused a different voting result.

The Board cannot deny the possibility that the numerous Board irregularities in this one-vote election could have caused a different result. In addition to the Region's outright misrepresentation regarding Lisa Wratten's ballot, additional errors included: (1) the Region failing adequately staff its phone lines and, despite Ms. Wratten leaving a voicemail on March 4, failing to mail a duplicate ballot kit to Wratten for six days, March 10; (2) the Region's failure to consider the impact mail delays had upon the fundamental fairness of the election where 10 percent of eligible voters experienced an irregularity with the Board's required method of voting; (3) the Region's failure to abide by its own regulations requiring it to issue an updated

20

Notice of Election containing important election details, including the date and time when ballots would be counted; and (4) the Region postponing a ballot count on the grounds that the Region had not received ballots from voters who told the Region they returned ballots, and then failing to ensure that Ms. Wratten, who told the Region she was returning a ballot, was given the chance to be enfranchised.

The National Labor Relations Act commands that union representatives must be selected "by the majority of the employees in a unit."  29 U.S.C. 159(a).  The entire purpose of Board elections is to determine whether majority status exists.  *See* 29 U.S.C. 159(c)(B). But there were and are serious, objective concerns that the election held in this matter did not represent the will of the majority of employees in the unit in this election.[6]  The Board, in contravention of its own standards, ignored those concerns.  The Petition for Review should be granted and the Board's Cross-Application for Enforcement denied.

## VI.    STANDING

Curaleaf is an employer within the meaning of section 2(2) of the Act. 29 U.S.C. § 152(2).  The Board's General Counsel issued a complaint alleging that Curaleaf violated sections 8(a)(5) and (1) of the Act.  The Board subsequently issued a final order finding that Curaleaf had unlawfully refused to recognize and bargain

---

[6] As majority status is required, an electoral tie is not sufficient to establish representative status under Section 9(a) of the NLRA.

with the Union. The Board's order directs that Curaleaf cease and desist from such conduct, post a Notice to Employees, and recognize and bargain with the Union. Curaleaf is an "aggrieved" party within the meaning of section 10(f) of the Act and has standing under that section to seek review of the Board's final order in this court.

## VII.   STANDARD OF REVIEW

When the Board has engaged in fact finding, the court assesses whether the Board's findings are supported by substantial evidence. *Int'l Trans. Svc., Inc. v. NLRB*, 449 F.3d 160, 163 (D.C. Cir. 2006). The Board "must present on the record 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pac. Micronesia Corp. v. NLRB*, 219 F.3d 661, 665 (D.C. Cir. 2000). The Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales and Svc., Inc. v. NLRB,* 522 U.S. 359, 378 (1998). The court's "review must take into account whatever in the record fairly detracts from the weight of the evidence cited by the Board to support its conclusions; we will not merely rubberstamp NLRB decisions." *Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1014 (D.C. Cir. 1995).

The Administrative Procedure Act prohibits administrative agencies, including the NLRB, from issuing orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See ABM Onsite-Servs.-West,*

22

*Inc. v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)). Board findings that do not evidence reasoned decision making are arbitrary and capricious and therefore unenforceable. *See National Hot Rod Assn. v. NLRB*, 988 F.3d 506 (D.C. Cir. 2021); *Everport Terminal Servs. v. NLRB*, 47 F.4th 782, 793-94 (D.C. Cir. 2022); *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020); *Tramont Mfg., LLC v. NLRB*, 890 F.3d 1114, 1119 (D.C. Cir. 2018). The Board must explain the basis for its findings and must not engage in logical errors. *See Sutter E. Bay Hosps. v. NLRB*, 687 F.3d 424, 436 (D.C. Cir. 2012); *Dupuy v. NLRB*, 806 F.3d 556, 564-65 (D.C. Cir. 2015).

Although the Board is entitled to deference, "Board orders will not survive review when the Board's decision "departs from established precedent without reasoned justification." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445-446 (D.C. Cir. 2004). "Without more, the Board's departure from precedent without a reasoned analysis renders its decision arbitrary and capricious." *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 119, 123 (D.C. Cir. 2001).

# VIII.  ARGUMENT

## A.  The Region's Misrepresentation and Other Irregularities Impairing the Legal Rights of the Parties Were Plainly the Type of Misconduct That Warranted Setting Aside the Election

The Board's conclusions with regard to the Board agent's misrepresentation are ultimately not supportable in two regards.  First, the Board misapplied its precedents regarding irregularities involving voter disenfranchisement to require a showing of actual, as opposed to *possible*, disenfranchisement.  Second, the Board failed to appreciate that this case is *both* a voter disenfranchisement case *and* a Board misconduct case warranting a rerun if either standard is met.

### 1.  The Board inappropriately imposed a heightened burden requiring Curaleaf to show *actual* disenfranchisement.  The correct standard requires a far lesser showing of *possible disenfranchisement*

The Board has published a long line of precedents addressing possible voter disenfranchisement, which should have compelled a rerun election in this case.  *See Garda World Security Corp.*, 356 NLRB 594, 594 (2011); *Wolverine Dispatch, Inc.*, 321 NLRB 796, 796-797 (1996); *Oneida County Community Action Agency, Inc.*, 317 NLRB 852 (1995), *Davis & Newcomer Elevator Co.,* 315 NLRB 715 (1994); *Dayton Malleable Iron Co.,* 123 NLRB 1707, 1709 (1959); *Star Baking Co.*, 119 NLRB 835 (1957), *North American Aviation, Inc.*, 81 NLRB 1046, 1048-1049 (1949).  In each of these (and other) cases, the Board has applied "an objective

24

standard to potential disenfranchisement cases in order to maintain the integrity of its election proceedings." *Garda World Security Corp.*, 356 NLRB 594, 594 (2011). Under that standard, "an election will be set aside if the objecting party shows that the number of voters *possibly* disenfranchised by an election irregularity is sufficient to affect the election outcome." *Id.* (citing *Wolverine Dispatch, Inc.*, 321 NLRB 796, 796-797 (1996)) (emphasis added); *see also National Hot Rod Assn. v. NLRB*, 988 F.3d 506 (D.C. Cir. 2021) ("under the Board's standard, it is only necessary for a challenger to an election to establish that it was *possible* for a Board irregularity to have caused a different voting result.")

This case presents a situation virtually identical to the one presented before this Court in *National Hot Rod Assn. v. NLRB*, 988 F.3d 506 (D.C. Cir. 2021). Like the present case, *NHRA* involved a one-vote margin election, the union receiving 35 votes, the company receiving 34 votes. *Id.* at 508. One voter, Robert Logan, contacted the Board on November 23 to obtain a duplicate ballot and left a voicemail. *Id.* at 148. Hearing nothing, he called again on November 25 and left a second voicemail. *Id.* He then called a third time on November 28, this time finally making contact. *Id.* The Region sent the duplicate ballot kit to Mr. Logan that same day. *Id.* Mr. Logan did not receive his duplicate ballot kit until nine days later, December 7, which was five days after the ballots were counted on December 2. *Id.*

Following the election, the company objected to the results of the election arguing the delays in processing replacement ballots prevented voters from returning their ballots on time. *Id.* As here, the Board rejected the company's objections and, instead of blaming itself, blamed the voters and the vagaries of mail delivery for any delays. *Id.*

In granting the petition for review, this Court explained that "[a]lthough employees have some responsibility for overcoming obstacles to voting, as we noted, if the Board itself causes an 'irregularity' and the number of voters *possibly* disenfranchised could affect the outcome of an election, no certification of the result is appropriate." *Id.* at 508-09 (emphasis added). "If the Board bore responsibility for his inability to vote, that is the end of the matter." *Id.* at 509. In finding the Board responsible, the Court found that Mr. Logan followed the instruction on the notice, but the Region failed to send his replacement ballot for five days. *Id.* Despite the Board's attempts to blame the delay on the USPS as opposed to its own delay, this Court rejected the Board's argument with the reminder that "it is only necessary for a challenger to an election to establish that it was possible for a Board irregularity to have caused a different voting result." *Id.*

As another example of the application of the standard requiring only *possible* disenfranchisement, in *Wolverine Dispatch,* a Board agent closed the polls during the middle of a voting session for *5 minutes.* 321 NLRB at 796-97. Thirty out of

26

thirty-four voters voted in the election. *Id.* In the four-vote margin election, the Board set aside the election because "it is possible that four eligible voters arrived at the polling area to vote during this hiatus, found no one present, and departed unnoticed by the Board agent or the observer." *Id.*

*Garda World Security* provides an even lesser standard for *possible* disenfranchisement. 356 NLRB at 594. Three minutes before the morning session was scheduled to end, 8:27 a.m., the Board agent began dismantling his equipment. *Id.* One minute before the end of the session, 8:29 a.m., three voters appeared at the polls. *Id.* They were told by the agent that they could either vote a challenged ballot at that time or return during the afternoon session. *Id.* The three departed without voting, but it was not disputed they returned and voted in the afternoon session. *Id.* The tally of ballots indicated that there were no challenged ballots and that the union had prevailed by a single vote. *Id.* Despite the fact that the three employees initially turned away did in fact cast ballots and that there was no evidence that any other employee was either aware that the polls had been closed a few minutes early or turned away, the Board sustained the employer's objection and set aside the election. *Id.* at 595. The reasoning was that approximately 20 eligible voters did not cast ballots and that under the objective standard in *Wolverine*, the "possibility of disenfranchisement" required overturning the election and directing a second election. *Id.* at 595.

Notwithstanding the foregoing precedents, in its decision here the Board cites *Guardsmark, LLC*, 363 NLRB 931 (2016) for the proposition that "a party must put forward evidence of actual prejudice, and this showing of prejudicial harm must be more than speculative to establish that a new election is required." *Id.* at 934.  The Board then goes on to find that, because no one can ascertain whether a second ballot count extension would have been granted, and the Region was not *obligated* to do so, the harm must be speculative.

In citing and finding this, the Board overstates the difference between "actual prejudice" versus "speculative harm".  Given *Garda* and *Wolverine* and *National Hot Rod Association*, "actual prejudice" is simply conduct that creates the possibility of disenfranchisement.  If the Board required "actual prejudice" to mean a concrete certainty, *Garda* and *Wolverine* would have clearly been decided differently—the Board would have required a finding that voters were *actually* disenfranchised instead of *possibly*.  Instead, *Garda* and *Wolverine* – and this Court's holding in *National Hot Rod Association* – make clear that in determining "actual prejudice" there is a basic potential causation between the irregularity and the possibility that a voter was disenfranchised.

*Guardsmark* proves Petitioner's point, contrary to the Board's reliance on that decision.  In the *Guardsmark* election, the union received eleven votes, the employer received two votes, and two votes were challenged.  363 NLRB at 931.  Eighteen

28

individuals did not vote.  The employer objected to the results of the election on the grounds that the Region issued allegedly faulty guidance that prohibited it from delivering a captive audience speech less than 24-hours before the ballots were mailed.  *Id.* at 932.  The theory was that, by being prohibited from delivering a last day captive audience speech and reminding voters of the upcoming vote, voters were disenfranchised.  *Id.*  In rejecting the employer's theory, the Board explained, "we fail to see how employees not being reminded again of the mailing date of the ballots in itself resulted in employees being unable to complete their ballots once received. The Employer's evidence of disenfranchisement is decidedly speculative."  *Id.* at 934.

The line drawing problem for "speculative harm" in *Guardsmark* is not present in this case.  Unlike *Guardsmark*, there is no attenuation between the irregularity and the potential disenfranchisement.  Instead, just as with *Garda* and *Wolverine*, there is a direct, potential causal line between the irregularity and potential disenfranchisement.  All elements are present.  First, the Board itself assumed the misrepresentation to be an "irregularity".  Second, Ms. Wratten actually voted.  Therefore, logically, if it was *possible* that the misrepresentation was the reason that Ms. Wratten's vote was not counted (i.e., a second postponement requested and granted), then the irregularity possibly resulted in disenfranchisement requiring that the election be set aside.  The Board's own decisions compel this

29

conclusion.  When the Board found that the Region was not *obligated* to grant a second extension, it also implicitly found that the Region *could* have granted a second extension.  This establishes the "possibility" of disenfranchisement element in a non-speculative fashion.

The Board's declaration that "nothing in Objection 2 hindered the casting of any votes or otherwise undermined the integrity of the election process" is disingenuous.  The conduct outlined in Objection 2 - the misrepresentation - prevented Ms. Wratten's ballot from being considered.  Plainly, the guaranteed exclusion of her ballot (a) did potentially hinder the casting of her vote and/or (b) undermined the integrity of the election process. For this reason alone, the petition for review should be granted.

> **2.**     **The misrepresentation in this case also qualifies as conduct that "tends to destroy confidence in the Board's election process or could reasonably be interpreted as impairing the election standards the Board seeks to maintain."**

As to the same conduct, the Board erred for a second time in concluding that the misrepresentation was an "irregularity" but was not conduct that "tends to destroy confidence in the Board's election process, or could reasonably be interpreted as impairing the election standards the Board seeks to maintain."  In a select number of circumstances, such as this, the conduct that creates an irregularity

can also simultaneously be conduct that destroys confidence in the Board's election process or impair Board election standards.

The standard for Board agent misconduct cases is set forth in *Athbro Precision Engineering Corp.*, 166 NLRB 966 (1967), *vacated on other grounds*, 171 NLRB 121 (1968), where the Board sustained the employer's objection and set aside an election because the Board agent drank beer with a union representative between voting sessions. The Board opined:

> The Board in conducting representation elections must maintain and protect the integrity and neutrality of its procedures. The commission of any act by a Board agent conducting an election which tends to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards we seek to maintain, is a sufficient basis for setting aside that election.

The Board continues to apply *Athbro* in cases where the Board agent's misconduct is in issue. *See, e.g.*, *Concrete Express of New York*, *LLC*, 368 NLRB No. 135 (2019) (hearing ordered on objection alleging that Board agent accepted ride from polling place with union officials).

As is made clear by Board precedent, application of the Board misconduct standard relates to more than Board neutrality—it also extends to certain conduct that simply calls the result of the election into question. *Jakel Inc.*, 293 NLRB 615, 616 (1989) (finding removal of a ballot from a ballot bag by Board agent objectionable conduct "which would destroy confidence in the Board's election

31

process.").  *Paprikas Fono*, 273 NLRB 1326, 1328 (1984) (setting aside an election for a Board agent's failure to properly secure challenged ballots); *Austill Waxed Paper Co.*, 169 NLRB 1109, 1110 (1968) (setting aside an election where the Board agent left a ballot box unattended and unsealed for 2 to 5 minutes).

In a footnote, the Board holds that it would not "find that an alleged misrepresentation concerning the status of a single outstanding ballot tends to destroy confidence in the overall election process."  (JA__; Board Dec. at 2, n. 6). To the contrary, the Board's ultimate approval of a critical misrepresentation that seriously impaired the rights of the parties to an election hinging on a single vote, cannot be justified under Board precedent.

Accurately communicating material facts to parties must be "an election standard [the Board] seeks to maintain." *Athbro*, 166 NLRB at 966.  Failure to do so compromises the integrity of the election process and would undeniably destroy confidence in the Board's election process. *Id.*  The Board's election system cannot function without this fundamental underpinning.  Ultimately, a material misrepresentation is no different in effect than the line of cases holding that lost ballot integrity warrants the setting aside of an election.  Notably, these cases do not turn upon whether the voters learn about the deficiencies or even whether there is an actual impact on the election.  These cases turn upon the simple fact that something happened that should not have happened.  "The Board goes to great lengths to ensure

32

that the manner in which an election was conducted raises *no reasonable doubt* as to the fairness and validity of the election." *Jakel*, 293 NLRB at 616 (emphasis added). The conduct at issue in this case establishes something well beyond reasonable doubt as to the fairness and validity of the election. For these reasons as well, the petition for review should be granted and the Board's cross-application for enforcement denied.

**B.  The Region's Conduct in Processing Ms. Wratten's Duplicate Ballot Kit Caused Delays With Ms. Wratten's Ballot That Establish Possible Disenfranchisement**

In this case, the Region caused delays that interfered with the proper handling of the election. First, applying *Aspirus Keweenaw*, 370 NLRB No. 45 (2020), Region 13 refused to conduct anything other than mail ballot elections during the time frame of the instant election. Second, despite knowing that all elections were being conducted via mail ballot (whether stipulated or through issuance of a decision and Direction of Election), which could require voters to contact the Region to request duplicate ballot kits, the Region failed to staff the phone numbers listed in the Notice of Election with Board personnel—requiring them to leave voice messages. Third, in at least the instance of Ms. Wratten, the evidence shows that she left a voicemail for the Region on March 4. Finally, without any other record contact between Ms. Wratten and the Region, the Region mailed a duplicate ballot kit to Ms. Wratten six days later, on March 10.

The evidence presented at the hearing established that the Region did not staff either of its phone lines. At hearing, Ms. Wratten testified that she attempted to call Region 13 on March 3 and 4 on two occasions but was unable to reach anyone. After being unsuccessful with her first two calls, on a third call on March 4, Ms. Wratten left a voicemail message. After leaving the voicemail message, Ms. Wratten received return phone calls from the Region but was unable to answer them. Based on the record, without any further contact, the Region did not ultimately mail a duplicate ballot kit to Ms. Wratten until March 10, 2021.

The Board failed to review and correct a basic factual error made by the ARD on Objection 1. The ARD found that Ms. Wratten did not leave a voicemail on March 4, "[t]he Employer's statement in its brief supporting its Exceptions that '[a]fter being unsuccessful with her first two phone calls, on a third call on March 4, Mr. (sic) Wratten left a voicemail message' is not supported by the record." First, this was Ms. Wratten's unrebutted testimony. (JA__; Tr. 45-46.) Second, it is undisputed that the Region began calling Ms. Wratten sometime after March 4. The Region would have not had reason to call Ms. Wratten if she did not leave a message. Third, without the record reflecting any additional contact between Ms. Wratten and the Region after March 4, the Region mailed Ms. Wratten a duplicate ballot kit on March 10. As the lack of a voicemail was a basis for the ARD's decision to overrule the Employer's objection, the ARD's decision was clearly erroneous.

34

Similarly, the ARD concluded that there was no evidence that Ms. Wratten requested a duplicate ballot at all. The ARD found "there was no record evidence demonstrating whether a duplicate ballot was actually requested by Wratten or that the duplicate was sent out in an abundance of caution by the Region when it was unable (after numerous attempts) to contact her directly." This is obviously factually incorrect. The record evidence shows the duplicate ballot kit was mailed to Ms. Wratten's new address. (JA__; GC Ex. 2.) The only way the Region would have known to contact her and known to send a duplicate ballot kit to her new address is if Ms. Wratten requested that a duplicate be sent to her new address—there was no other way for the Region to know about Ms. Wratten's new address. As this was another basis for the ARD's decision to overrule the Employer's objection, the ARD's conclusion was factually erroneous and the Board erred in not granting review.

The incorrect factual conclusions compounded the ARD's error regarding the irregularity caused by the Region's failure to timely mail a duplicate ballot kit. In mail ballot cases, eligible voters must be given "adequate notice and opportunity to vote," and not be "prevented from voting by the conduct of a party or by unfairness in the scheduling or mechanics of the election." *Lemco Construction, Inc.*, 283 NLRB 459, 460 (1987). And, again, when a party's objections are based on alleged misconduct by the Board Agent conducting the election, the Board will consider

35

"whether the manner in which the election was conducted raises a reasonable doubt as to the fairness and validity of the election."  *Polymers, Inc.*, 174 NLRB 282, 282 (1969), *enfd.* 414 F.2d 999 (2d Cir. 1969); *see also Avante at Boca Raton*, 323 NLRB 555, 558 (1997).  The ultimate test is whether the Board was at fault in preventing a determinative voter from casting a ballot.

Here, as in this Court's *NHRA* decision, Ms. Wratten encountered delays in the processing of her duplicate mail ballot kit as a direct result of the Board's inexplicable decision to provide unstaffed phone numbers in the Notice of Election and its failure to immediately send a duplicate ballot kit.  As to Ms. Wratten's delay specifically, the evidence shows that Ms. Wratten began her attempts to contact the Region on or about March 3 or 4, played "phone tag" with the Board, and, without any record evidence of contact between Ms. Wratten and the Region after the March 4 voicemail, was not mailed a duplicate ballot kit until March 10.

This delay was primarily caused by the Region's decision to not staff its phones, listen to the voicemail, and se nd a duplicate ballot kit.  Had someone answered or sent a ballot immediately (as is called for under NLRB Representation Casehandling Manual Section 11336.4), the duplicate ballot kit would have been mailed up to 6 days earlier than it ultimately was.  As Ms. Wratten's ballot arrived only one day after the ballot count, any hint of unjustified delay created the possibility of disenfranchisement.  And, of course, in this one-vote margin election,

36

the possibility of disenfranchisement was potentially outcome determinative. The delay raises a doubt as to the fairness and validity of the election just as in *NHRA*.

Finally, just as in *NHRA*, the Regional Director's argument that Wratten was to blame for the delay is unavailing. The ARD faulted Ms. Wratten for an apparent "lack of diligence and interest" in voting. The timeline demonstrates that this is both factually and legally incorrect.

| March 3 | Ms. Wratten calls the Region to request a duplicate ballot kit, does not leave a message |
| March 4 | Ms. Wratten calls the Region to request a duplicate ballot kit, leaves a message |
| March 4 | Date in Notice of Election by which employees should call the Region to request a duplicate ballot kit |
| March 10 | Duplicate ballot kit sent to Ms. Wratten by Region |
| March 15 | Duplicate ballot kit received by Ms. Wratten |
| March 18 | Duplicate ballot returned by Ms. Wratten via U.S. mail |
| March 31 | Ballot count |
| April 1 | Duplicate ballot received by Region |

(JA__; Tab 1 at 3, 4, 5.) The record evidence shows that out of the 28 days between March 3 and the ballot count on March 31, Ms. Wratten was solely responsible for

a delay of three days—the period from the time of the receipt of her duplicate ballot kit on March 15 and her mailing the duplicate ballot on March 18. Objectively, a three-day turnaround, mailing the ballot thirteen days prior to the ultimate ballot count, is not and never has been a "lack of diligence" excusing the delays beyond her control both before she received her duplicate ballot kit and after she mailed the duplicate ballot kit. The ARD's case citations demonstrate as much. In *National Van Lines*, 120 NLRB 1343 (1956), the Board found that voters lacked diligence and interest in voting where the voters mailed their ballots between two and five days prior to the ballot count. *Id.* at 1346. In *Waste Management of Northwest Louisiana*, 326 NLRB 1389 (1998), the voter at issue simply never arrived at the polling location. *Id.* at 1389. Of import, *National Van Lines* appears to support Employer's position. In applying the lack of diligence test, the Board must consider whether there was a "lack of diligence and interest in mailing their ballots *on a date which would have assured their timely receipt by the Regional Director*." 120 NLRB at 1346 (emphasis added). Here, Ms. Wratten's mailing thirteen days in advance of the ultimate ballot count excuses her from any finding of fault. In every situation, voters have a right to expect that first-class mail would be delivered within the City of Chicago within 13 days. The ARD's finding that Ms. Wratten was to blame for the Region's untimely receipt of her ballot is not supported by Board precedent.

38

**C.      General Delays With The USPS Should Invalidate The Election.**

In mail ballot cases, eligible voters must be given "adequate notice and opportunity to vote," and not be "prevented from voting by the conduct of a party or by unfairness in the scheduling or mechanics of the election." *Lemco Construction, Inc.*, 283 NLRB 459, 460 (1987) (emphasis added). Here, problems and delays with the USPS establish unfairness in the mechanics of the election.

Overall, the record evidence shows that (1) Ms. Wratten's ballot took *fourteen days* to be mailed from Ms. Wratten's apartment in Chicago to the Region's office in downtown Chicago—only 8 miles away from the Region 13 office, (2) Ms. Kaplan's ballot was mailed in Chicago on March 8, 2021, but to date has never been received by the Region—this despite the fact the ballot only had to travel some 6 miles from the drop box to the Region 13 office and (3) the Region allegedly mailed Mr. Coffman's ballot on February 25, 2021, but it was never been received by the Coffman nor returned as undeliverable to the Region.

Thirty-one ballots were mailed out by the Region in this election. At hearing, the Employer provided evidence that three of these ballots were impacted by problems with the USPS. It cannot be the case that the Region, through the Board's guidance under *Aspirus Keweenaw*, 370 NLRB No. 45 (2020), would exclusively require mail ballot elections and then accept the results of a mail ballot election where there is evidence that nearly ten percent of the ballots mailed were impacted

39

by the flaws with the Board's method of voting.  For context, in a manual election, the Board would clearly not accept a voting mechanism whereby, arbitrarily, ten percent of the voters would be disenfranchised through no fault of their own.

Here, the ARD attempted to justify the failure of the USPS noting that the issues with the USPS were "beyond the control of a party or the Board".  But this argument proves too much—the Board is the entity that *required* the Parties, under *Aspirus Keweenaw* and the pandemic conditions existing at the time of the pre-election discussions, to undergo a mail ballot election.  In this situation, the Board and the USPS share equal responsibility for the improper outcome.  There was no other defined method for voting – mail balloting was the exclusive choice – imposed by the Board.

At some point, the problems with the performance of the USPS warranted a finding that the prevalence of issues with mail delivery exceed the "vagaries of mail delivery" and constitute unfairness in the mechanics of the election and a failure to conduct valid elections in furtherance of Section 9(a) of the National Labor Relations Act—requiring that the labor organization be selected by a majority of the employees in the unit.  29 U.S.C. § 159(a).  As former Chairman Miscimarra noted in *Premier Util. Servs., LLC* and *Classic Valet Parking, Inc.*, "'in an extremely unusual case . . . when our regular procedures have been deficient,' the Board's normal rules must be balanced against our statutory responsibility to assure that

40

employees have been reasonably permitted to freely exercise their rights under the Act." 363 NLRB No. 159 (Apr. 5, 2016) (Miscimarra, dissenting); 363 NLRB No. 23 (Oct. 23, 2015) (Miscimarra, dissenting).

The flawed mail ballot election conducted in this case is precisely the unusual case former Chairman Miscimarra contemplated. It is frustrating for everyone involved in this election, from the Board, to the Parties, to the voters, but the problems with this election undermine any confidence in the NLRB election process. The mail ballot election conducted in this case failed to effectuate the purposes of the Act, and there is no basis for concluding that the 11-10 tally in favor of representation represents the will of the employees. There is substantial doubt as to the fairness and validity of the election. The fundamental failure of the mail ballot election in this case, in and of itself, warrants granting the petition for review and the establishment of safeguards to protect the will of the voters and the purposes of the Act.

**D.    The Region's Failure To Issue An Amended Notice Of Election Either Invalidated The Election *Per Se* Or Possibly Resulted In Disenfranchisement**

Objection 5 addresses the Region's failure to issue an amended Notice of Election accurately reflecting the alteration of the date and time of the ballot count. The Board denied review of the ARD's decision. The ARD overruled the Employer's objection finding that nothing in the Board's Rules and Regulations or

procedures required the Region to issue an amended notice of election, and because the alleged harm was speculative.  The ARD's decision is facially contrary to Board regulations and precedent.

Failure to provide an accurate Notice of Election outlining the terms of the election constitutes either *per se* objectionable conduct or an objectionable election irregularity.  Contrary to the ARD's decision, there is no language in Section 102.62(e) indicating that issuance of a Notice of Election is a one-time event. Section 102.62(e) provides:

> (e) Notice of Election. Upon approval of the election agreement pursuant to paragraph (a) or (b) of this section or with the direction of election pursuant to paragraph (c) of this section, the Regional Director shall promptly transmit the Board's Notice of Election to the parties and their designated representatives by email, facsimile, or by overnight mail (if neither an email address nor facsimile number was provided). The employer shall post and distribute the Notice of Election in accordance with §102.67(k). The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of §102.69(a)(8). A party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

29 C.F.R § 102.62(e).  The referenced Section 102.67(k) further provides:

> (k) Notice of Election.  The employer shall post copies of the Board's Notice of Election in conspicuous places, including all places where notices to employees in the unit are customarily posted, at least 3 full working days prior to 12:01 a.m. of the day of the election and shall also distribute it electronically to all eligible voters (including individuals permitted to vote subject to challenge) if the employer

customarily communicates with employees in the unit electronically. In elections involving mail ballots, the election shall be deemed to have commenced the day the ballots are deposited by the Regional Office in the mail. **In all cases, the notices shall remain posted until the end of the election.** For the purposes of this subpart, the term working day shall mean an entire 24-hour period excluding Saturdays, Sundays, and holidays. The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). A party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

29 C.F.R § 102.67(k) (emphasis added).

Here, the Parties stipulated, and the Region agreed, to modify the Stipulated Election Agreement originally entered into under Section 102.62(b) by changing the date and time of the ballot count. By Rule, a 102.62(b) stipulated election agreement must contain "the time and place of holding the election." *Id.* Thus, under Section 102.62(e), after the modification to the Stipulated Election Agreement was approved, the Regional Director was required to transmit a Notice of Election reflecting the modified Stipulated Election Agreement. Failure of the Regional Director to issue the required Notice of Election was *per se* objectionable under Section 102.62(e) and 102.67(k), requiring an election to be set aside when an employer fails to properly post or distribute the required election notices. To find otherwise would entirely nullify the requirement of Section 102.67(k) that the notice must be posted **until the end of the election**. A notice serves no purpose to voters

43

if it contains dates indicating the election is over when it, in fact, is not. A notice of election can only serve its purpose under the Board's regulations if it contains accurate information about the start and end of the election.

Beyond a *per se* requirement that the election be set aside, the NLRB's Casehandling Manual (Part 2), Section 11314 requires a Notice of Election posting to contain the date, time, and place where ballots will be commingled and counted. Although the Board's Casehandling Manual is not a legally binding document in the same sense as the Board's official decisions or its duly promulgated rules and regulations, *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1182 (D.C. Cir. 1999), it may, in the context of a Stipulated Election Agreement that sets forth the agreed-upon election mechanics, define or shed light on those mechanics and related procedures. *See NCR,* 840 F.3d at 842. And it may, under the Board's precedents, establish an obligation that, if ignored, would constitute an "irregularity" that warrants setting aside an election. *Davis & Newcomer,* 315 NLRB 715 (failure to mail duplicate ballot as required by Casehandling Manual disenfranchised voter and required that Board set aside election). Such is the case here.

As the postponement of the ballot count changed a required term of the Notice of Election pursuant to the Casehandling Manual, a new Notice of Election was required. This follows because where a Notice of Election is not accurate in any significant way and could cause confusion among the voters, the election must be

set aside. *In Re Woods Quality Cabinetry Co.*, 340 NLRB 1355, 1356 (2003). The ARD attempted to sidestep *In Re Woods Quality Cabinetry* by claiming that the erroneous Notice of Election in that case required a rerun only because the erroneous designation "reasonably tended to interfere with the election process . . ." The ARD's argument presents a distinction without a difference. Substantial errors or omissions on a Notice of Election will reasonably tend to interfere with the election process. *See Rattan Art Gallery, Ltd.*, 260 NLRB 255, 257 (1982) (setting aside election because the Notice was posted in such a manner as to cover the "Rights of Employees" section); *Walker Vehicle Co.*, 7 NLRB 827, 833 (1938) (finding incorrect naming of Union caused disadvantage in balloting—even with subsequent correction of Notice). Listing the incorrect date and time of an election interferes with the election process at least as much, and likely significantly more than posting an election notice in such a manner as to cover the "Rights of Employees" section.

Also, contrary to the ARD's decision, any potential harm from the failure to amend the Notice of Election was not speculative. Again, the standard for whether this irregularity required that the election be set aside requires this Court to analyze whether it is *possible* that the irregularity to have caused a different voting result. *NHRA*, 988 F.3d at 509. If the failure to post a substantially correct Notice of Election was an objectionable election irregularity, the irregularity was potentially outcome determinative because, excluding Ms. Wratten and Ms. Kaplan, there were

45

nine additional voters that did not return ballots.  It is *possible* that had any one of these voters received proper notice from the Board regarding the new ballot count date and time, these voters may have voted.  Although the ARD concluded that he "fail[ed] to see how employees not being reminded that they had additional time to return ballots resulted in employees being unable to complete their ballots once received", this conclusion is erroneous and easily countered.  The failure to provide an amended Notice of Election causes harm if (1) an employee was of the belief that the count was proceeding on March 22, (2) did not learn of the postponed count, and (3) elected to not return a ballot believing that it was too late to do so.  As this is possible and any one vote would have been potentially outcome determinative, even absent *per se* effect, the election must be set aside.

Thus the Board has failed to follow its own policies: employees must be provided with a substantially true and correct Notice of Election, or else the election is invalid.  Rightfully, Board policy requires voters to be informed as to the correct date, time, and place where ballots will be commingled and counted.  Here, the date and time of the ballot count in the Notice, as defined by Section 11314, were substantially in accurate.  This warrants granting the petition for review and setting aside the results of the election.

**E.    The Board's Failure to Enforce the Employer's and Union's Request to the General Counsel To Subpoena Pertinent Testimony and Documents Further Justifies Granting The Petition For Review**

Prior to the hearing at issue, Employer filed a request for Board testimony and documents with the General Counsel under Section 102.118.  (Er. Ex. 2.)  The evidence sought was uniquely in the possession of the Region and was directly pertinent to Employer's objections.  The General Counsel's office, through Region 7 Region Director Terry Morgan, denied the Employer's request for testimony in full and denied nearly all requests for documents, ultimately agreeing only to produce "the voter list used during the ballot count and the Region's internal list showing the dates it received ballots and the dates any duplicate mail-ballot kits were sent to voters. In addition, at the hearing, the late arriving yellow mail-ballot envelope (both front and back) will be made available for examination via video." (Er. Ex. 3.)  The only legal support offered by the General Counsel was that this case did not involve "unusual circumstances" under *Laidlaw Transit, Inc.*, 327 NLRB 315 (1999), and concluding that the testimony of witnesses other than the Board agent or any other Agency personnel would be sufficient.  (*Id.*)

Every step of the way, the reviewing entities of the Board and the Board itself entirely ignored the fact that Petitioner had been denied access to evidence to support its claims related board agent misconduct and delays in the Region's processing of

47

ballots.  To the extent the Board now argues that evidence in the record is lacking, such arguments must be denied given the Board's failure to produce evidence relevant to its conduct.

Contrary to the General Counsel's claims below, the evidence requested by the Petitioner was objectively not capable of being obtained through the testimony of other witnesses.  The General Counsel's broad denial of Board agent testimony and production of documents was contrary to Board precedent.  To the extent necessary to resolve any of the Employer's objections, the General Counsel's denial of testimony and documents warrants granting the petition for review.

## IX.    CONCLUSION

Curaleaf respectfully requests that this Court grant the petition for review and deny the cross-application for enforcement.

/s/Maurice Baskin

Maurice Baskin
Stefan Marculewicz
Littler Mendelson, PC
815 Connecticut Ave, N.W., Ste. 400
Washington, D.C. 20006
T: (202) 842-3400
F: (202) 842-0011
mbaskin@littler.com
smarculewicz@littler.com

*Attorneys for Petitioner GHG Management LLC*

48

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to FRAP 27(d)(2) the Petitioner certifies that this motion contains 11,740 words of proportionally-spaced, 14-point type, and the word processing system used was Microsoft Word.

*/s/Maurice Baskin*
Maurice Baskin

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Petitioner's Initial Brief was electronically transmitted to the Court this 3rd day of April, 2023, using the Court's ECF filing system, and was served on all counsel via electronic notice pursuant thereto.

*/s/Maurice Baskin*
Maurice Baskin

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**SECTION 2 OF THE NLRA** .......................................................................... A-1

**SECTION 8 OF THE NLRA** .......................................................................... A-1

**SECTION 9 OF THE NLRA** .......................................................................... A-2

**SECTION 10 OF THE NLRA** ........................................................................ A-2

**SECTION 706 OF THE APA** ......................................................................... A-2

**29 CFR § 102.118** ....................................................................................... A-2

## Section 2 of the NLRA, 29 U.S.C. § 152(2)

**(2)** The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C. 151 et seq.], as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

## Section 8 of the NLRA, 29 U.S.C. § 158:

It shall be an unfair labor practice for an employer—

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

**(2)** to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of

this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

**(3)** by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**(4)** to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

**(5)** to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

## Section 9 of the NLRA, 29 U.S.C. § 159:

**(a)** EXCLUSIVE REPRESENTATIVES; EMPLOYEES' ADJUSTMENT OF GRIEVANCES DIRECTLY WITH EMPLOYER

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the

exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.

**(b) DETERMINATION OF BARGAINING UNIT BY BOARD**

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: Provided, That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

**(c) HEARINGS ON QUESTIONS AFFECTING COMMERCE; RULES AND REGULATIONS**

**(1)** Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

**(A)** by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a), or (ii) assert that the individual or labor organization,

A-3

which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a); or

**(B)** by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a);

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

**(2)** In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 160(c) of this title.

**(3)** No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

**(4)** Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

**(5)** In determining whether a unit is appropriate for the purposes specified in subsection (b) the extent to which the employees have organized shall not be controlling.

**(d) PETITION FOR ENFORCEMENT OR REVIEW; TRANSCRIPT**

Whenever an order of the Board made pursuant to section 160(c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title, and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

**(e) SECRET BALLOT; LIMITATION OF ELECTIONS**

**(1)** Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

**(2)** No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held.

## Section 10 of the NLRA, 29 U.S.C. § 160:

### (e) Petition to court for enforcement of order; proceedings; review of judgment

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and

thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

**(f) Review of final order of Board on petition to court**

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining

order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

## Section 706 of the APA, 5 U.S.C. § 706:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— * * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 29 CFR § 102.62

**§ 102.62 Election agreements; voter list; Notice of Election.**

Link to an amendment published at 88 FR 14911, Mar. 10, 2023.

**(a)** *Consent-election agreements with final Regional Director determinations of post-election disputes.* Where a petition has been duly filed, the employer and any individual or labor organizations representing a substantial number of employees involved may, with the approval of the Regional Director, enter into an agreement providing for the waiver of a hearing and for an election and further providing that post-election disputes will be resolved by the Regional Director. Such agreement, referred to as a consent election agreement, shall include a description of the appropriate unit, the time and place of holding the election, and the payroll period to be used in determining what employees within the appropriate unit shall be eligible to vote. Such election shall be conducted under the direction and supervision of the Regional Director. The method of conducting such election shall be consistent with the method followed by the Regional Director in conducting elections pursuant to §§ 102.69 and 102.70 except that the rulings and determinations by the Regional Director of the results thereof shall be final, and the Regional Director shall issue to the parties a certification of the results of the election, including certifications of representative where appropriate, with the same force and effect, in that case, as if issued by the Board, and except that rulings or determinations by the Regional Director in respect to any amendment of such certification shall also be final.

**(b)** *Stipulated election agreements with discretionary Board review.* Where a petition has been duly filed, the employer and any individuals or labor organizations representing a substantial number of the employees involved may, with the approval of the Regional Director, enter into an agreement providing for the waiver of a hearing and for an election as described in paragraph (a) of this section and further providing that the parties may request Board review of the Regional Director's resolution of post-election disputes. Such agreement, referred to as a stipulated election agreement, shall also include a description of the appropriate bargaining unit, the time and place of holding the election, and the payroll period to be used in determining which employees within the appropriate unit shall be eligible to vote. Such election shall be conducted under the direction and supervision of the Regional Director. The method of conducting such election and the post-election procedure shall be consistent with that followed by the Regional Director in conducting elections pursuant to §§ 102.69 and 102.70.

**(c)** *Full consent election agreements with final Regional Director determinations of pre- and post-election disputes.* Where a petition has been duly filed, the

A-8

employer and any individual or labor organizations representing a substantial number of the employees involved may, with the approval of the Regional Director, enter into an agreement, referred to as a full consent election agreement, providing that pre- and post-election disputes will be resolved by the Regional Director. Such agreement provides for a hearing pursuant to §§ 102.63, 102.64, 102.65, 102.66, and 102.67 to determine if a question of representation exists. Upon the conclusion of such a hearing, the Regional Director shall issue a decision. The rulings and determinations by the Regional Director thereunder shall be final, with the same force and effect, in that case, as if issued by the Board. Any election ordered by the Regional Director shall be conducted under the direction and supervision of the Regional Director. The method of conducting such election shall be consistent with the method followed by the Regional Director in conducting elections pursuant to §§ 102.69 and 102.70, except that the rulings and determinations by the Regional Director of the results thereof shall be final, and the Regional Director shall issue to the parties a certification of the results of the election, including certifications of representative where appropriate, with the same force and effect, in that case, as if issued by the Board, and except that rulings or determinations by the Regional Director in respect to any amendment of such certification shall also be final.

**(d)** *Voter list.* Absent agreement of the parties to the contrary specified in the election agreement or extraordinary circumstances specified in the direction of election, within 5 business days after the approval of an election agreement pursuant to paragraph (a) or (b) of this section, or issuance of a direction of election pursuant to paragraph (c) of this section, the employer shall provide to the Regional Director and the parties named in the agreement or direction a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular "cell" telephone numbers) of all eligible voters. The employer shall also include in separate sections of that list the same information for those individuals who will be permitted to vote subject to challenge. In order to be timely filed and served, the list must be received by the Regional Director and the parties named in the agreement or direction respectively within 5 business days after the approval of the agreement or issuance of the direction unless a longer time is specified in the agreement or direction. The list of names shall be alphabetized (overall or by department) and be in an electronic format approved by the General Counsel unless the employer certifies that it does not possess the capacity to produce the list in the required form. When feasible, the list shall be filed electronically with the Regional Director and served electronically on the other parties named in the agreement or direction. A certificate of service on all parties shall be filed with the

Regional Director when the voter list is filed. The employer's failure to file or serve the list within the specified time or in proper format shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). The employer shall be estopped from objecting to the failure to file or serve the list within the specified time or in the proper format if it is responsible for the failure. The parties shall not use the list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters.

**(e)** *Notice of Election.* Upon approval of the election agreement pursuant to paragraph (a) or (b) of this section or with the direction of election pursuant to paragraph (c) of this section, the Regional Director shall promptly transmit the Board's Notice of Election to the parties and their designated representatives by email, facsimile, or by overnight mail (if neither an email address nor facsimile number was provided). The employer shall post and distribute the Notice of Election in accordance with § 102.67(k). The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). A party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

### 29 CFR § 102.67

**§ 102.67 Proceedings before the Regional Director; further hearing; action by the Regional Director; appeals from actions of the Regional Director; statement in opposition; requests for extraordinary relief; Notice of Election; voter list.**

Link to an amendment published at 88 FR 14912, Mar. 10, 2023.

**(a)** *Proceedings before Regional Director.* The Regional Director may proceed, either forthwith upon the record or after oral argument, the submission of briefs, or further hearing, as the director may deem proper, to determine whether a question of representation exists in a unit appropriate for purposes of collective bargaining as provided in § 102.64(a), and to direct an election, dismiss the petition, or make other disposition of the matter. A decision by the Regional Director upon the record shall set forth the director's findings, conclusions, and order or direction.

**(b)** *Directions of elections.* If the Regional Director directs an election, the direction may specify the type, date(s), time(s), and location(s) of the election and the eligibility period, but the Regional Director retains discretion to continue investigating these details after directing an election and to specify them in a

subsequently-issued Notice of Election. The Regional Director shall schedule the election for the earliest date practicable, but unless a waiver is filed, the Regional Director will normally not schedule an election before the 20th business day after the date of the direction of election, to permit the Board to rule on any request for review which may be filed pursuant to paragraph (c) of this section. The Regional Director shall transmit the direction of election to the parties and their designated representatives by email, facsimile, or by overnight mail (if neither an email address nor facsimile number was provided). The Regional Director shall also transmit the Board's Notice of Election to the parties and their designated representatives by email, facsimile, or by overnight mail (if neither an email address nor facsimile number was provided), whether transmitted simultaneously with the direction of election or separately thereafter. If the direction of election provides for individuals to vote subject to challenge, the Notice of Election shall so state, and shall advise employees that the individuals are neither included in, nor excluded from, the bargaining unit, inasmuch as they have been permitted to vote subject to challenge. The election notice shall further advise employees that the eligibility or inclusion of the individuals will be resolved, if necessary, following the election.

**(c)** *Requests for Board review of Regional Director actions.* Upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a Regional Director delegated to him/her under Section 3(b) of the Act except as the Board's Rules provide otherwise. The request for review may be filed at any time following the action until 10 business days after a final disposition of the proceeding by the Regional Director. The filing of such a request shall not, unless otherwise ordered by the Board, operate as a stay of the election or any other action taken or directed by the Regional Director, except that if a request for review of a decision and direction of election is filed within 10 business days of that decision and has not been ruled upon or has been granted before the election is conducted, ballots whose validity might be affected by the Board's ruling on the request for review or decision on review shall be segregated in an appropriate manner, and all ballots shall be impounded and remain unopened pending such ruling or decision. A party retains the right to file a request for review of a decision and direction of election more than 10 business days after that decision issues, but the pendency of such a request for review shall not require impoundment of the ballots.

**(d)** *Grounds for review.* The Board will grant a request for review only where compelling reasons exist therefor. Accordingly, a request for review may be granted only upon one or more of the following grounds:

**(1)** That a substantial question of law or policy is raised because of:

**(i)** The absence of; or

**(ii)** A departure from, officially reported Board precedent.

**(2)** That the Regional Director's decision on a substantial factual issue is clearly erroneous on the record and such error prejudicially affects the rights of a party.

**(3)** That the conduct of any hearing or any ruling made in connection with the proceeding has resulted in prejudicial error.

**(4)** That there are compelling reasons for reconsideration of an important Board rule or policy.

**(e)** *Contents of request.* A request for review must be a self-contained document enabling the Board to rule on the basis of its contents without the necessity of recourse to the record; however, the Board may, in its discretion, examine the record in evaluating the request. With respect to the ground listed in paragraph (d)(2) of this section, and other grounds where appropriate, the request must contain a summary of all evidence or rulings bearing on the issues together with page citations from the transcript and a summary of argument. Such request may not raise any issue or allege any facts not timely presented to the Regional Director.

**(f)** *Opposition to request.* Any party may, within 5 business days after the last day on which the request for review must be filed, file with the Board a statement in opposition which shall be served in accordance with the requirements of paragraph (i) of this section. The Board may grant or deny the request for review without awaiting a statement in opposition. No reply to the opposition may be filed except upon special leave of the Board.

**(g)** *Finality; waiver; denial of request.* The Regional Director's actions are final unless a request for review is granted. The parties may, at any time, waive their right to request review. Failure to request review shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the Regional Director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding.

**(h)** *Grant of review; briefs.* The grant of a request for review shall not, outside of the provision for impoundment set forth in paragraph (c) of this section, stay the Regional Director's action unless otherwise ordered by the Board. Except where the Board rules upon the issues on review in the order granting review, the appellants

and other parties may, within 10 business days after issuance of an order granting review, file briefs with the Board. Such briefs may be reproductions of those previously filed with the Regional Director and/or other briefs which shall be limited to the issues raised in the request for review. No reply briefs may be filed except upon special leave of the Board. Where review has been granted, the Board may provide for oral argument or further hearing. The Board will consider the entire record in the light of the grounds relied on for review and shall make such disposition of the matter as it deems appropriate. Any request for review may be withdrawn with the permission of the Board at any time prior to the issuance of the decision of the Board thereon.

**(i)** *Format, Service, and Extensions* -

**(1)** *Format of request.* All documents filed with the Board under the provisions of this section shall be double spaced, on 8 1/2- by 11-inch paper, and shall be printed or otherwise legibly duplicated. Extra copies of electronically-filed papers need not be filed. Requests for review, including briefs in support thereof and any motions under paragraph (j) of this section; statements in opposition thereto; and briefs on review shall not exceed 50 pages in length exclusive of subject index and table of cases and other authorities cited, unless permission to exceed that limit is obtained from the Board by motion, setting forth the reasons therefor, filed pursuant to the procedures set forth in § 102.2(c). Where any brief filed pursuant to this section exceeds 20 pages, it shall contain a subject index with page references and an alphabetical table of cases and other authorities cited. A party may combine a request for review of the Regional Director's decision and direction of election with a request for review of a Regional Director's post-election decision, if the party has not previously filed a request for review of the pre-election decision. A party may not, however, file more than one request for review of a particular action or decision by the Regional Director. Repetitive requests will not be considered.

**(2)** *Service.* The party filing with the Board a request for review, a statement in opposition to a request for review, or a brief on review shall serve a copy thereof on the other parties and shall file a copy with the Regional Director. A certificate of service shall be filed with the Board together with the document.

**(3)** *Extensions.* Requests for extensions of time to file requests for review, statements in opposition to a request for review, or briefs, as permitted by this section, shall be filed pursuant to § 102.2(c) with the Board or the Regional Director, as the case may be, except that no extension of time will be granted to circumvent the impoundment provisions set forth in paragraph (c) of this section. The party filing the request for an extension of time shall serve a copy thereof on the

other parties and, if filed with the Board, on the Regional Director. A statement of such service shall be filed with the document.

**(j) *Requests for extraordinary relief.***

**(1)** A party requesting review may also move in writing to the Board for one or more of the following forms of relief:

**(i)** Expedited consideration of the request;

**(ii)** A stay of some or all of the proceedings, including the election; or

**(iii)** Impoundment and/or segregation of some or all of the ballots.

**(2)** Relief will be granted only upon a clear showing that it is necessary under the particular circumstances of the case. The pendency of a motion does not entitle a party to interim relief, and an affirmative ruling by the Board granting relief is required before the action of the Regional Director will be altered in any fashion.

**(k) *Notice of Election.*** The employer shall post copies of the Board's Notice of Election in conspicuous places, including all places where notices to employees in the unit are customarily posted, at least 3 full working days prior to 12:01 a.m. of the day of the election and shall also distribute it electronically to all eligible voters (including individuals permitted to vote subject to challenge) if the employer customarily communicates with employees in the unit electronically. In elections involving mail ballots, the election shall be deemed to have commenced the day the ballots are deposited by the Regional Office in the mail. In all cases, the notices shall remain posted until the end of the election. For the purposes of this subpart, the term working day shall mean an entire 24-hour period excluding Saturdays, Sundays, and holidays. The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). A party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

**(l) *Voter list.*** Absent extraordinary circumstances specified in the direction of election, the employer shall, within 5 business days after issuance of the direction, provide to the Regional Director and the parties named in such direction a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular "cell" telephone numbers) of all eligible voters. The employer shall also include in separate sections of that list the same information for

those individuals who will be permitted to vote subject to challenge. In order to be timely filed and served, the list must be received by the Regional Director and the parties named in the direction respectively within 5 business days after issuance of the direction of election unless a longer time is specified therein. The list of names shall be alphabetized (overall or by department) and be in an electronic format approved by the General Counsel unless the employer certifies that it does not possess the capacity to produce the list in the required form. When feasible, the list shall be filed electronically with the Regional Director and served electronically on the other parties named in the direction. A certificate of service on all parties shall be filed with the Regional Director when the voter list is filed. The employer's failure to file or serve the list within the specified time or in proper format shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). The employer shall be estopped from objecting to the failure to file or serve the list within the specified time or in the proper format if it is responsible for the failure. The parties shall not use the list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters.


## 29 CFR § 102.118

**§ 102.118 Present and former Board employees prohibited from producing documents and testifying; production of witnesses' statements after direct testimony.**

**(a)** *Prohibition on producing files and documents.* Except as provided in § 102.117 respecting requests cognizable under the Freedom of Information Act, no present or former employee or specially designated agent of the Agency will produce or present any files, documents, reports, memoranda, or records of the Board or of the General Counsel, whether in response to a *subpoena duces tecum* or otherwise, without the written consent of the Board or the Chairman of the Board if the document is in Washington, DC, and in control of the Board; or of the General Counsel if the document is in a Regional Office of the Board or is in Washington, DC, and in the control of the General Counsel. A request that such consent be granted must be in writing and must identify the documents to be produced, the nature of the pending proceeding, and the purpose to be served by the production of the documents.

**(b)** *Prohibition on testifying.* No present or former employee or specially designated agent of the Agency will testify on behalf of any party to any cause pending in any court or before the Board, or any other board, commission, or other administrative agency of the United States, or of any State, territory, or the District of Columbia, or any subdivisions thereof, with respect to any information, facts, or other matter coming to that person's knowledge in that person's official capacity or with respect to the contents of any files, documents, reports, memoranda, or records of the Board or of the General Counsel, whether in answer to a subpoena or otherwise, without the written consent of the Board or the Chairman of the Board if the person is in Washington, DC, and subject to the supervision or control of the Board or was subject to such supervision or control when formerly employed at the Agency; or of the General Counsel if the person is in a Regional Office of the Agency or is in Washington, DC, and subject to the supervision or control of the General Counsel or was subject to such supervision or control when formerly employed at the Agency. A request that such consent be granted must be in writing and must identify the person whose testimony is desired, the nature of the pending proceeding, and the purpose to be served by the testimony of the official.

**(c)** *Motion to quash subpoena.* Whenever any subpoena *ad testificandum* or subpoena *duces tecum,* the purpose of which is to adduce testimony or require the production of records as described above, has been served on any present or former employee or specially designated agent of the Agency, that person will, unless otherwise expressly directed by the Board or the Chairman of the Board or the General Counsel, as the case may be, move pursuant to the applicable procedure, whether by petition to revoke, motion to quash, or otherwise, to have such subpoena invalidated on the ground that the evidence sought is privileged against disclosure by this Rule.

**(d)** *Prohibition on disclosure of personal information.* No present or former employee or specially designated agent of the Agency will, by any means of communication to any person or to another agency, disclose personal information about an individual from a record in a system of records maintained by this Agency, as more fully described in the notices of systems of records published by this Agency in accordance with the provisions of Section (e)(4) of the Privacy Act of 1974, 5 U.S.C. 552a(e)(4), or by the Notices of Government-wide Systems of Personnel Records published by the Civil Service Commission in accordance with those statutory provisions, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be in accordance with the provisions of Section (b)(1) through (11), both inclusive, of the Privacy Act of 1974, 5 U.S.C. 552a(b)(1) through (11).

A-16

**(e)** *Production of statement for cross-examination.* Notwithstanding the prohibitions of paragraphs (a) and (b) of this section, after a witness called by the General Counsel or by the Charging Party has testified in a hearing upon a complaint under Section 10(c) of the Act, the Administrative Law Judge must, upon motion of the Respondent, order the production of any statement, as defined paragraph (g) of this section, of such witness in the possession of the General Counsel which relates to the subject matter as to which the witness has testified.

**(1)** If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the Administrative Law Judge must order the statement to be delivered directly to the respondent for examination and use for the purpose of cross-examination.

**(2)** If the General Counsel claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the Administrative Law Judge will order the General Counsel to deliver the statement for the inspection of the Administrative Law Judge *in camera.* Upon delivery, the Administrative Law Judge will excise the portions of such statement which do not relate to the subject matter of the testimony of the witness except that the Administrative Law Judge has discretion to decline to excise portions which, although not relating to the subject matter of the testimony of the witness, do relate to other matters raised by the pleadings. With the material excised, the Administrative Law Judge will then direct delivery of the statement to the Respondent for use on cross-examination. If any portion of the statement is withheld and the Respondent objects to the withholding, the General Counsel will preserve the entire text of the statement, and, if the Respondent files exceptions with the Board based upon such withholding, make the entire text available to the Board for the purpose of determining the correctness of the ruling of the Administrative Law Judge. If the General Counsel elects not to comply with an order of the Administrative Law Judge directing delivery to the Respondent of any statement, or portion thereof as the Administrative Law Judge may direct, the Administrative Law Judge will strike from the record the testimony of the witness.

**(f)** *Production of statement in postelection hearings.* The provisions of paragraph (e) of this section will also apply after any witness has testified in any postelection hearing pursuant to § 102.69(d) and any party has moved for the production of any statement, as defined in paragraph (g) of this section, of the witness in possession of any agent of the Board which relates to the subject matter as to which the witness has testified. The authority exercised by the Administrative Law Judge

under paragraph (e) of this section will be exercised by the Hearing Officer presiding.

**(g)** *Definition of statement.* The term *statement* as used in this section means:

**(1)** A written statement made by the witness and signed or otherwise adopted or approved by the witness; or

**(2)** A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by the witness to an agent of the party obligated to produce the statement and recorded contemporaneously with the making of the oral statement.

A-18