**Nos. 22-1312 & 23-1015**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**GHG MANAGEMENT LLC,
d/b/a WINDY CITY CANNABIS, d/b/a CURALEAF WEED STREET**

**Petitioner/Cross-Respondent**

**v.**

**NATIONAL LABOR RELATIONS BOARD**

**Respondent/Cross-Petitioner**

_____

**ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD**

_____

**BRIEF FOR
THE NATIONAL LABOR RELATIONS BOARD**

_____

**USHA DHEENAN**
*Supervisory Attorney*

**JARED D. CANTOR**
*Senior Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-2948**
**(202) 273-0016**

**JENNIFER ABRUZZO**
*General Counsel*
**PETER SUNG OHR**
*Deputy General Counsel*
**RUTH E. BURDICK**
*Deputy Associate General Counsel*
**DAVID HABENSTREIT**
*Assistant General Counsel*

**National Labor Relations Board**

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Local Rule 28(a)(1) of the Rules of this Court, counsel for the National Labor Relations Board ("the Board") certifies the following:

## A. Parties and Amici

GHG Management LLC, d/b/a Windy City Cannabis, d/b/a Curaleaf Weed Street, was the Respondent before the Board and is Petitioner/Cross-Respondent before the Court.  The Board is the Respondent/Cross-Petitioner before the Court; its General Counsel was a party before the Board.  The United Food and Commercial Workers Local 881 was the charging party before the Board.  There were no intervenors or amici before the Board.

## B. Ruling Under Review

The ruling under review is a Decision and Order of the Board in *GHG Management LLC d/b/a Windy City Cannabis and d/b/a Curaleaf Weed Street*, 372 NLRB No. 13 (Dec. 5, 2022).

## C. Related Cases

This case has not previously been before this or any other court.  Board counsel is not aware of any related cases.

## TABLE OF CONTENTS

**Headings**                                                                 **Page(s)**

Statement of subject matter and appellate jurisdiction ...............................................1

Statement of the issue .........................................................................................3

Relevant statutory and regulatory provisions ............................................................3

Statement of the case...........................................................................................3

   I.   Procedural history .......................................................................................4

      A.   The representation proceeding..............................................................4

      B.   The unfair-labor-practice proceeding ....................................................7

  II.   The Board's conclusions and Order ................................................................7

Summary of argument..........................................................................................8

Standard of review .............................................................................................11

Argument...........................................................................................................12

      Substantial evidence supports the Board's finding that the Company
      violated Section 8(a)(5) and (1) of the Act by refusing to recognize
      and bargain with the Union ....................................................................12

      A.   The party seeking to set aside an election bears a heavy burden.......13

      B.   The Board acted within its wide discretion in overruling
           Objection 1 ......................................................................................14

           1.   Additional relevant facts............................................................14

           2.  Applicable principles .................................................................16

## **TABLE OF CONTENTS**

**Headings**                                                                 **Page(s)**

3.  Objection 1: employees had adequate notice of, and
    opportunity to vote in, the election and were not prevented
    from voting by the Region or by any unfairness in the
    election's scheduling or mechanics ...............................................18

    a.  The Company consented to a mail-ballot election .................18

    b.  The late arrival and untimely return of Wratten's duplicate
        ballot do not warrant setting aside the election .......................20

    c.  Problems with mail delivery do not warrant a new election ...24

    d.  The Company's remaining challenges are unavailing ............28

        i.   *National Hod Rod* is not controlling ................................28

        ii.  The Company's voicemail-related claims are misplaced
             or jurisdictionally barred ...................................................30

C.  The Board acted within its wide discretion in overruling
    Objections 2, 4 and 5 ..........................................................................31

    1.  Applicable principles ..................................................................31

    2.  Objection 2: the Board agent's email to the parties did not raise
        a reasonable doubt as to the election's fairness and validity ........32

        a.  Additional relevant facts...........................................................32

        b.  The Company failed to prove that the agent's alleged
            misrepresentation raised a reasonable doubt as to the
            election's fairness and validity, and it proffered only
            speculative harm ..................................................................33

        c.  The Company's two-fold challenge to the Board's
            application of the reasonable-doubt test is meritless..............37

ii

## <u>TABLE OF CONTENTS</u>

**Headings**                                                                                     **Page(s)**

    3.  Objection 4:  the Region postponed the ballot count based on the parties' agreement ............................................................... 42

    4.  Objection 5:  the absence of a new or amended notice of election—which was not required—did not raise a reasonable doubt as to the election's fairness and validity ............................. 44

  D.  The Company's cursorily briefed claims about access to evidence are waived ........................................................................... 51

Conclusion ........................................................................................ 55

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                          **Page(s)**

*800 River Rd. Operating Co. v. NLRB*,
  846 F.3d 378 (D.C. Cir. 2017) ........................................................ 12

*Am. Bottling Co. v. NLRB*,
  992 F.3d 1129 (D.C. Cir. 2021) ........................................... 31, 36, 38

*Amalgamated Clothing & Textile Workers v. NLRB*,
  736 F.2d 1559 (D.C. Cir. 1984) ...................................................... 14

*Am. Med. Response*,
  356 NLRB 199 (2010), *enforced*,
  477 F. App'x 743 (D.C. Cir. 2012)....................................................36

*Antelope Valley Bus Co. v. NLRB*,
  275 F.3d 1089 (D.C. Cir. 2002) .................................. 11, 13, 14, 15, 17, 27, 28

*Aspirus Keweenaw*,
  370 NLRB No. 45, 2020 NLRB LEXIS 541 (Nov. 9, 2020) ........................... 19

*Athbro Precision Eng'g Corp.*,
  166 NLRB 966 (1967) ....................................................... 40, 41, 42

*Austill Waxed Paper Co.*,
  169 NLRB 1109 (1968) ................................................................. 42

*Boire v. Greyhound Corp.*,
  376 U.S. 473 (1964) ..................................................................... 2

*C.J. Krehbiel Co. v. NLRB*,
  844 F.2d 880 (D.C. Cir. 1988) ....................................................... 11

*Cassell v. FCC*,
  154 F.3d 478 (D.C. Cir. 1998) ....................................................... 41

*Ceridian Corp. v. NLRB*,
  435 F.3d 352 (D.C. Cir. 2006) ....................................................... 41

*Classic Valet Parking, Inc.*,
  363 NLRB 249 (2015) ..................................................... 17, 25, 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                       **Page(s)**

*Concrete Express of NY, LLC,*
  368 NLRB No. 135, 2019 NLRB LEXIS 688 (Dec. 10, 2019) ........................ 41

*Davis & Newcomer Elevator Co.,*
  315 NLRB 715 (1994) ............................................................................ 40, 49

*Durham Sch. Servs., LP v. NLRB,*
  821 F.3d 52 (D.C. Cir. 2016) ...................................................................... 32, 38

*Exxon Chem. Co. v. NLRB,*
  386 F.3d 1160 (D.C. Cir. 2004) ...................................................................... 12

*Fresenius USA Mfg.,*
  352 NLRB 679 (2008) ................................................................................... 38

*Freund Baking Co.,*
  330 NLRB 17 (1999) ....................................................................................... 3

*G.H.R. Foundry Div., Dayton Malleable Iron Co.,*
  123 NLRB 1707 (1959) ................................................................................. 40

*Garda CL Atl., Inc.,*
  356 NLRB 594 (2001) ............................................................................. 16, 40

*Guardsmark, LLC,*
  363 NLRB 931 (2016) ................................................. 31, 32, 35, 36-37, 38, 47

*J. Ray McDermott & Co. v. NLRB,*
  571 F.2d 850 (5th Cir. 1978) ........................................................................ 17

*Jakel, Inc.,*
  293 NLRB 615 (1989) ................................................................................... 41

*Laidlaw Transit,*
  327 NLRB 315 (1998) ................................................................................... 52

*Lemco Constr., Inc.,*
  283 NLRB 459 (1987) .......................................................... 17, 18, 27, 39, 40

*Lockheed Martin Skunk Works,*
  331 NLRB 852 (2000) ................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Magnum Transp., Inc.*,
    360 NLRB 1093 (2014) ........................................................................ 38-39

*N. Am. Aviation, Inc.*,
    81 NLRB 1046 (1949) ........................................................................... 40

*N. of Market Senior Servs., Inc. v. NLRB*,
    204 F.3d 1163 (D.C. Cir. 2000) ......................................................... 12

*Nat'l Hot Rod Ass'n v. NLRB*,
    988 F.3d 506 (D.C. Cir. 2021) ........................................... 28, 29, 40

*Nat'l Van Lines*,
    120 NLRB 1343 (1958) ...................................................................... 24

*NCR Corp. v. NLRB*,
    840 F.3d 838 (D.C. Cir. 2016) ..................................................... 25, 26

*NLRB v. A. J. Tower Co.*,
    329 U.S. 324 (1946) ..................................................................... 11, 13

*NLRB v. Downtown BID Servs. Corp.*,
    682 F.3d 109 (D.C. Cir. 2012) ..................................................... 11, 13

*NLRB v. Hood Furniture Mfg. Co.*,
    941 F.2d 325 (5th Cir. 1991) .............................................................. 13

*NSTAR Elec. & Gas Corp. v. FERC*,
    481 F.3d 794 (D.C. Cir. 2007) ........................................................... 53

*NY Rehab. Care Mgmt., LLC v. NLRB*,
    506 F.3d 1070 (D.C. Cir. 2007) ..................................................... 42-43

*Oneida Cnty. Cmty. Action Agency, Inc.*,
    317 NLRB 852 (1995) ........................................................................ 40

*Pace Univ. v. NLRB*,
    514 F.3d 19 (D.C. Cir. 2008) ............................................................. 31

*Paprikas Fono*,
    273 NLRB 1326 (1984) ...................................................................... 42

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Patient Care of Pa., Inc.*,
  360 NLRB 637 (2014) ..................................................... 39

*Polymers, Inc.*,
  174 NLRB 282 (1969) ................................................. 31, 38

*Premier Util. Servs., LLC*,
  363 NLRB 1524 (2016) ................................................... 26

*Rattan Art Gallery, Ltd.*,
  260 NLRB 255 (1982) ..................................................... 50

*Rochester Joint Bd. v. NLRB*,
  896 F.2d 24 (2d Cir. 1990) .............................................. 16

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) .......................................... 53

*St. Vincent Hosp., LLC*,
  344 NLRB 586 (2005) ..................................................... 16

*Star Baking Co.*,
  119 NLRB 835 (1957) ..................................................... 40

*T&L Leasing*,
  318 NLRB 324 (1995) ................................................. 19-20

*United Food & Commercial Workers Int'l Union v. NLRB*,
  852 F.2d 1344 (D.C. Cir. 1988) ........................................ 13

*United States v. Baugham*,
  449 F.3d 167 (D.C. Cir. 2006) .......................................... 53

*United States v. Zannino*,
  895 F.2d 1 (1st Cir. 1990) ............................................. 53

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ..................................................... 11

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Versail Mfg., Inc.*,
  212 NLRB 592 (1974) ........................................................ 18, 23, 25, 27

*Walker Vehicle Co.*,
  7 NLRB 827 (1938) ........................................................................ 50

*Waste Mgmt. of Nw. La., Inc.*,
  326 NLRB 1389 (1998) ............................................................... 17, 27

*Wayneview Care Ctr. v. NLRB*,
  664 F.3d 341 (D.C. Cir. 2011) ......................................................... 11

*Wolverine Dispatch, Inc.*,
  321 NLRB 796 (1996) ..................................................................... 40

*Woods Quality Cabinetry Co.*,
  340 NLRB 1355 (2003) ................................................................... 50

**Statutes**                                                               **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ............................................................... 12
Section 8(a)(1) (29 U.S.C. § 158(a)(1)).....................................3, 7, 12, 13
Section 8(a)(5) (29 U.S.C. § 158(a)(5)) .................................... 3, 7, 12, 13
Section 9(c) (29 U.S.C. § 159(c)) ........................................................ 2
Section 9(d) (29 U.S.C § 159(d)) ....................................................... 2
Section 10(a) (29 U.S.C. § 160(a)) ..................................................... 2
Section 10(e) (29 U.S.C. § 160(e)) ........................................... 11, 30, 31
Section 10(f) (29 U.S.C. § 160(f)).................................................... 2

**Regulations**                                                            **Page(s)**

29 C.F.R. § 102.62(e) .................................................................. 45-46
29 C.F.R. § 102.65(e)(1)-(2) ............................................................ 30
29 C.F.R. § 102.67(k) ..................................................................... 48

# <u>TABLE OF AUTHORITIES</u>

**Miscellaneous**                                                                **Page(s)**

Fed. R. App. P. 28(a)(8)(A) ................................................................. 53

NLRB Casehandling Manual (Part 2) § 11314.1 (2020) ....................................... 49

NLRB Casehandling Manual (Part 2) § 11314.1-.7 (2020) ...................................45

# GLOSSARY

| | |
|---|---|
| Br. | The Company's opening brief |
| DCR | The Acting Regional Director's Decision and Certification of Representative |
| D&O | The Board's Decision and Order |
| DRO | The Board's Decision on Review and Order |
| ER | Exhibit introduced by the Company |
| HOR | The Hearing Officer's Report |
| JTX | Joint exhibit |
| MSJ Ex. | Exhibit attached to the General Counsel's Motion for Summary Judgment |
| Tr. | Transcript of the hearing |
| The Act | National Labor Relations Act, 29 U.S.C. § 151, et seq. |
| The Board | National Labor Relations Board |
| The Company | GHG Management LLC, d/b/a Windy City Cannabis, d/b/a Curaleaf Weed Street |
| The Order | *GHG Management LLC d/b/a Windy City Cannabis and d/b/a Curaleaf Weed Street*, 372 NLRB No. 13 (Dec. 5, 2022) |
| The Union | United Food and Commercial Workers Local 881 |

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

**Nos. 22-1312 & 23-1015**

———————————————

**GHG MANAGEMENT LLC,
d/b/a WINDY CITY CANNABIS, d/b/a CURALEAF WEED STREET**

**Petitioner/Cross-Respondent**

**v.**

**NATIONAL LABOR RELATIONS BOARD**

**Respondent/Cross-Petitioner**

———————————————

**ON PETITION FOR REVIEW AND
CROSS-APPLICATION FOR ENFORCEMENT OF
AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD**

———————————————

**BRIEF FOR
THE NATIONAL LABOR RELATIONS BOARD**

———————————————

**STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION**

This case is before the Court on the petition of GHG Management LLC,

d/b/a Windy City Cannabis, d/b/a Curaleaf Weed Street ("the Company") to

review, and the cross-application of the National Labor Relations Board to enforce,

a Board Decision and Order issued against the Company on December 5, 2022,

2

and reported at 372 NLRB No. 13.  (D&O 1-4.)[1]  The Board had jurisdiction over the proceeding below under Section 10(a) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151, 160(a), and the Board's Order is final.  The Court has jurisdiction over this proceeding and venue is proper under Section 10(f) of the Act.  29 U.S.C. § 160(f).  The petition and cross-application were timely.

As the Board's unfair-labor-practice Order is based, in part, on findings made in an underlying representation (union election) proceeding (D&O 1), the record in that proceeding (Board Case No. 13-RC-271360) is also before the Court pursuant to Section 9(d) of the Act, 29 U.S.C § 159(d).  *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477-79 (1964).  Under Section 9(d), the Court has jurisdiction to review the Board's actions in the representation proceeding solely for the purpose of "enforcing, modifying or setting aside in whole or in part the [unfair-labor-practice] order of the Board."  29 U.S.C. § 159(d).  The Board retains authority under Section 9(c) of the Act, 29 U.S.C. 159(c), to resume processing the

---

[1]  In this proof brief, "D&O" refers to the Board's Decision and Order, "DRO" to the Board's Decision on Review and Order, "DCR" to the Acting Regional Director's Decision and Certification of Representative, and "HOR" to the hearing officer's report on objections.  From the objections hearing, "Tr." references are to the transcript, "JTX" to joint exhibits, and "ER" to the Company's exhibits.  "MSJ Ex." references are to exhibits attached to the General Counsel's motion for summary judgment.  References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

representation case in a manner consistent with the ruling of the Court.  *See Freund Baking Co.*, 330 NLRB 17, 17 n.3 (1999) (citing cases).

## STATEMENT OF THE ISSUE

The ultimate issue is whether substantial evidence supports the Board's finding that the Company's admitted refusal to recognize and bargain with United Food and Commercial Workers Local 881 ("the Union"), its employees' certified representative, violated Section 8(a)(5) and (1) of the Act.  That question turns on the underlying issue of whether the Board acted within its wide discretion in overruling the Company's election objections and certifying the Union.

## RELEVANT STATUTORY AND REGULATORY PROVISIONS

Relevant sections of the Act and the Board's regulations are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

In this unfair-labor-practice case, the Company defends its admitted refusal to bargain by asserting that the Board erroneously certified the Union in the representation proceeding.  If the Court agrees that the Board acted within its wide discretion in overruling the Company's election objections, then the certification is valid and the refusal to bargain violates the Act.

4

## I.     PROCEDURAL HISTORY

### A.     The Representation Proceeding

The Company employs "product specialists," who work at a retail cannabis dispensary located in Chicago, Illinois.  (D&O 1; MSJ Ex. 17 ¶ 2, Tr. 43, 63, 71-72.)  On January 11, 2021, the Union petitioned for an election to represent a unit of product specialists.  (HOR 2; MSJ Ex. 1.)  The parties subsequently reached a stipulated election agreement for an election by mail ballot.  (DRO 1; MSJ Ex. 2.)

Under the election agreement, the Board's Region 13 (Chicago) office was to mail ballot kits to eligible voters on February 25, the Region had to receive voters' completed ballots by March 19, and the Region was to count ballots on March 22 at 10:00 a.m.  The agreement further provided that voters who had not received their ballot kits could request duplicates by contacting Region 13 before 5:00 p.m. on March 4.  Finally, the agreement provided that in the event the election or ballot count was postponed or cancelled, the Regional Director for Region 13 had the discretion to reschedule the date, time, and place of the election or count.  (DRO 1 & n.3; MSJ Ex. 2.)

The Region subsequently issued an official notice of election to employees, which was posted at the workplace.  The notice listed the February 25 mailing of ballots and the March 4 deadline to request duplicate ballot kits, and included two telephone numbers for voters to call to make their request.  The notice explained

that the Region would count ballots at 10:00 a.m. on March 22 and that ballots had to be received beforehand to be valid and counted.  (DRO 1; JTX 3.)

Based on "a concern that not all mail ballots mailed back to the Regional Office ha[d] been received," the parties entered into a stipulated agreement on March 19 that extended the voting period until March 29 and postponed the ballot count until March 31.  (DRO 1; JTX 4.)  The Acting Regional Director for Region 13 approved the parties' stipulated agreement that same day.  (DRO 1; JTX 5.)  On March 31, the Region counted the ballots.  Out of 29 eligible voters, 11 employees voted for union representation and 10 employees voted against it.  (DRO 1; MSJ Ex. 4.)  Of the eight remaining eligible voters, one employee's ballot arrived at the regional office after the ballot count, a second employee's ballot never arrived at the Region, and a third employee never received the ballot kit that the Region had mailed to him.  (DCR 5; JTX 10, Tr. 63-66, 72-75, 114.)

The Company thereafter filed five objections to the election.  Specifically, the Company alleged that: 1) delays attributable to the Region's processing of ballots and to the United States Postal Service's delivery of mail resulted in voter disenfranchisement; 2) a Board agent engaged in misconduct by failing to notify the parties about at least one known outstanding ballot as of the March 31 ballot count, resulting in voter disenfranchisement; 3) a Board agent engaged in misconduct by contacting only certain voters to confirm whether they had received

or returned their ballots; 4) the Region unilaterally forced the postponement of the ballot count until March 31; and 5) the Region failed to issue a new notice of election providing updated information to employees after it postponed the ballot count.[2]  (DCR 2; MSJ Ex. 5.)

Following a virtual hearing in Region 7 (Detroit), a Board hearing officer prepared a Report on Objections in which he concluded that the Company failed to establish that the alleged Board agent misconduct, Region 13 procedural irregularities, or other ostensibly objectionable conduct raised a reasonable doubt as to the election's fairness and validity.[3]  (HOR 1-16.)  The Company filed exceptions to the hearing officer's report.  (Employer's Exceptions to HOR 1-8.)  After considering the Company's exceptions, the Acting Regional Director for Region 7 overruled the objections and certified the Union as the unit employees' bargaining representative.  (DCR 1-12.)

The Company then filed a request for review of the Acting Regional Director's Decision and Certification of Representative.  (MSJ Ex. 9.)  On April 21, 2022, the Board (Members Kaplan, Wilcox and Prouty) granted the request for

---

[2]  The Company has abandoned its third objection before the Court and, therefore, the Board's brief will not address it.  (Br. 5 n.2.)

[3]  Prior to the hearing, the Board transferred the case from Region 13 to Region 7. (MSJ Ex. 6.)

review as to Objection 2, which alleged that a Board agent affected the election's outcome by misrepresenting the status of a single mail ballot.  (DRO 1.)  On review, the Board (Members Wilcox and Prouty, Member Kaplan dissenting) affirmed the Acting Regional Director's overruling of the objection, but it did so only for the reasons stated in its decision.  (DRO 1-3.)  In all other respects, the Board denied the Company's request for review, thus leaving the remainder of the Acting Regional Director's decision undisturbed.  (DRO 1.)

### B.     The Unfair-Labor-Practice Proceeding

On April 26, 2022, the Union requested that the Company recognize and bargain with it as the product specialists' certified representative, but the Company refused.  (D&O 2; MSJ Ex. 11-12.)  Based on the Union's subsequent unfair-labor-practice charge and amended charge, the Board's General Counsel issued a complaint alleging that the Company's refusal violated Section 8(a)(5) and (1) of the Act and moved the Board for summary judgment.  (D&O 1; MSJ & Ex. 15.)  In response, the Company reasserted its challenge to the Union's certification.  (D&O 1; MSJ Ex. 17, Employer's Resp. to Notice to Show Cause 1-20.)

## II.     THE BOARD'S CONCLUSIONS AND ORDER

On December 5, 2022, the Board (Members Kaplan, Wilcox, and Prouty) issued its Decision and Order granting the motion for summary judgment and finding that the Company had violated Section 8(a)(5) and (1) by refusing to

recognize and bargain with the Union.  (D&O 1 & n.1, 2.)  The Board concluded that all representation issues the Company raised in the unfair-labor-practice proceeding were, or could have been, litigated in the underlying representation proceeding, and that the Company did not offer any newly discovered or previously unavailable evidence, or allege any special circumstances that would require the Board to reexamine its decision in the earlier proceeding.  (D&O 1 & nn.2-3.)

To remedy the unfair labor practice, the Board's Order requires the Company to cease and desist from failing and refusing to recognize and bargain with the Union or, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their Section 7 rights.  The Order further directs the Company to bargain with the Union on request, to embody any resulting understanding in a signed agreement, and to post a remedial notice.  (D&O 2-3.)

## SUMMARY OF ARGUMENT

The Company failed to carry the heavy burden of proving that any of its objections require overturning the representation election.  Therefore, the Board acted within its wide discretion by overruling each of them.

The Board acted within its discretion when it overruled Objection 1 because employees had adequate notice of, and opportunity to vote in, the mail ballot election, and they were not prevented from voting by the Region's conduct or any

unfairness in the election's scheduling or mechanics. The Company's three-fold argument falls flat.

First, it wrongly blames the Region for delays associated with mail elections, ignoring that the parties voluntarily chose that method, the Region did not dictate it. Second, the evidence established that Lisa Wratten was responsible for the late arrival and untimely return of her mail ballot, not the Region or a Board agent as the Company maintains. Significantly, Wratten never left a message requesting a duplicate ballot when calling the prescribed telephone numbers. After eventually leaving a voicemail on a Board agent's cellphone, she knowingly ignored the agent's repeated return calls. Even then, the agent ensured that Wratten received her duplicate ballot well before the vote count. Wratten, though, inexplicably waited three days to return it, and it arrived one day after the count. Third, under well-established precedent, the Postal Service's "general failures" are not grounds for a new election.

Applying the governing test to claims of Board agent misconduct, the Board acted within its discretion by overruling Objection 2 because the agent's alleged misrepresentation of the status of Wratten's outstanding ballot did not raise a reasonable doubt as to the election's fairness and validity. Crucially, there was no showing that the agent's statement affected voters' ability to receive or cast ballots. Thus, as to the dispositive question of the election's validity, the alleged

misrepresentation did not undermine the election's integrity.  In rejecting the objection, the Board found that the Company failed to prove actual, non-speculative prejudice owing to the agent's failure to mention Wratten's outstanding ballot.  And contrary to its assertions, the Board properly applied the reasonable-doubt test and its associated evidentiary burden in overruling the objection.

The Board also acted within its discretion in overruling Objection 4 because there was no evidence the Region engaged in misconduct by unilaterally postponing the ballot count.  To the contrary, the Acting Regional Director took that action per the parties' agreement.  The Company has waived any challenge to the Board's overruling of this objection.

Lastly, the Board acted within its discretion by overruling Objection 5 because the absence of an amended notice of election listing the postponed ballot count did not raise a reasonable doubt as to the election's fairness and validity. Here, the undisputed evidence established both the validity of the as-issued notice, which complied with pertinent Board rules, regulations, and procedures, and that the postponement's stated purpose was to allow in-transit ballots to reach the Region.  Moreover, there was no evidence that voters did not vote due to the lack of an amended notice.  The Company cites no authority that per se misconduct occurs where, on these facts, the region does not issue another notice, and it offers

only speculation that the absence of an amended notice affected the election, which is insufficient under the governing standard.

## STANDARD OF REVIEW

The Court's "role in reviewing an NLRB decision is limited." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011). When supported by substantial evidence on the record as a whole, the Board's findings of fact are "conclusive." 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477.

Furthermore, the "scope of [judicial] review of the Board's rulings regarding [an] election is extremely limited." *NLRB v. Downtown BID Servs. Corp.*, 682 F.3d 109, 112 (D.C. Cir. 2012) (internal quotation marks omitted). Consistent with Congressional intent, the Court accords the Board an especially "wide degree of discretion" on questions involving representation elections. *Antelope Valley Bus Co. v. NLRB*, 275 F.3d 1089, 1095 (D.C. Cir. 2002) (quoting *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330 (1946)). The "case for deference is strong[]," the Court has explained, "as Congress has charged the Board, a special and expert body, with the duty of judging the tendency of electoral flaws to distort the employees' ability to make a free choice." *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 885 (D.C. Cir. 1988) (internal quotation marks omitted). Accordingly, the Court overturns a

Board-supervised election "only in the rarest of circumstances," and it will enforce a Board order overruling an employer's election objections unless the Board abused its discretion and the abuse of discretion was prejudicial. *800 River Rd. Operating Co. v. NLRB*, 846 F.3d 378, 386 (D.C. Cir. 2017) (quoting *N. of Market Senior Servs., Inc. v. NLRB*, 204 F.3d 1163, 1167 (D.C. Cir. 2000)).

## ARGUMENT

### SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY REFUSING TO RECOGNIZE AND BARGAIN WITH THE UNION

Section 7 of the Act grants employees the right to choose a representative and to have that representative bargain with their employer on their behalf. 29 U.S.C. § 157. Employers have a corresponding duty to bargain with their employees' chosen representatives, and a refusal to do so violates Section 8(a)(5) of the Act. 29 U.S.C. § 158(a)(5). Finally, a violation of Section 8(a)(5) creates a derivative violation of Section 8(a)(1), which makes it unlawful for an employer to "interfere with, restrain, or coerce employees" in the exercise of their Section 7 rights. 29 U.S.C. § 158(a)(1). *See Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1163-64 (D.C. Cir. 2004).

Here, the Company admittedly refused to bargain with the Union in order to challenge the Board's certification of the Union as bargaining representative. As the following discussion demonstrates, however, the Board acted well within its

wide discretion in overruling the Company's election objections.  Given the Company's undisputed refusal to bargain, substantial evidence thus supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act, and the Board is entitled to enforcement of its Order.  *See Downtown BID Servs.*, 682 F.3d at 112.

### A.    The Party Seeking To Set Aside an Election Bears a Heavy Burden

"Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees."  *A.J. Tower*, 329 U.S. at 330. *Accord Antelope Valley*, 275 F.3d at 1095 (Court "is without authority to impose upon the [Board] the kind of election procedures that it may deem most appropriate").  The results of a Board-supervised representation election are "not lightly set aside" and "[t]here is a strong presumption that ballots cast under specific NLRB procedural safeguards reflect the true desires of the employees." *Lockheed Martin Skunk Works*, 331 NLRB 852, 854 (2000) (quoting *NLRB v. Hood Furniture Mfg. Co.*, 941 F.2d 325, 328 (5th Cir. 1991)).  *Accord United Food & Commercial Workers Int'l Union v. NLRB*, 852 F.2d 1344, 1348 (D.C. Cir. 1988).

Although the Board has long strived for "laboratory conditions" in elections, the Court has recognized that this "noble ideal . . . must be applied flexibly" and it

is "for the Board in the first instance" to determine "when laboratory conditions have sufficiently deteriorated to require a rerun election." *Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559, 1562 (D.C. Cir. 1984). Moreover, the standard for overturning an election is demanding because ordering a rerun election poses its own danger to the effectuation of employee free choice. *Id.* at 1563-64. Accordingly, as the Court has concluded, the party seeking to overturn a Board-supervised election "carries a heavy burden of showing the election's invalidity." *Antelope Valley*, 275 F.3d at 1095 (internal quotation marks omitted) (emphasizing Board does not bear "burden of demonstrating the validity of an election").

## B.   The Board Acted Within Its Wide Discretion in Overruling Objection 1

As shown below, ample evidence supports the Board's finding that the Company failed to carry its heavy burden of proving that alleged delays with the Region's processing of ballots or the Postal Service's delivery of mail required a new election. Therefore, the Board acted well within its discretion in overruling Objection 1.

### 1.   Additional relevant facts

Lisa Wratten was an eligible voter, but did not receive her original ballot kit mailed by the Region on February 25, 2021, because she had moved and failed to

update her address with the Company.[4]  (HOR 4; Tr. 43-44.)  On March 3 and 4,

Wratten called the telephone numbers listed on the posted election notice to

request a duplicate ballot kit.  Wratten's calls were not answered and she did not

leave voicemail messages.  At some point in early March, a coworker provided

Wratten with the cellphone number of a Board agent.  Wratten called that number

in the beginning of March and left a voicemail message stating that she needed a

duplicate ballot sent to a new address.  (DRO 1 & n.4, HOR 4; Tr. 44-47, 56-57.)

The Board agent attempted to contact Wratten, but she was too "busy with work

and school" to answer any of the agent's telephone calls.  (DRO 1, HOR 5; Tr. 47-

48, 51, 58.)

On March 10, the Board agent mailed Wratten a duplicate ballot kit and also

sent Wratten a text message stating that the duplicate ballot had been mailed.

(DRO 1, HOR 5; Tr. 60.)  On March 15, Wratten received the duplicate ballot kit

and that same day the Board agent sent Wratten a text message to confirm its

delivery.  Wratten replied to the agent on March 16, confirming receipt of her

duplicate ballot and stating that she would mail it back to the Region that same

day.  Wratten, though, did not mail her ballot until March 18.  (DRO 1, HOR 5; ER

---

[4]  As required, the Company previously had provided the Region with the names
and addresses of all eligible voters.  *Antelope Valley*, 275 F.3d at 1090.

1, Tr. 49, 52-55.)  Wratten's ballot arrived at Region 13 on April 1, the day after the official ballot count.  (DRO 1; JTX 10.)

Anna Kaplan and Jonathan Coffman also were eligible voters.  Kaplan received her ballot kit on March 5 and mailed it back to Region 13 on March 8.  As of April 28, the date of the objections hearing, the Region had not received her ballot.  Coffman never received his mail ballot kit and he never contacted the Region about it.  (DCR 5, HOR 4; Tr. 63-66, 72-75, 114.)

### 2.    Applicable principles

"The Board applies an objective standard to potential disenfranchisement cases in order to maintain the integrity of its own election proceedings.  Under that standard, an election will be set aside if the objecting party shows that the number of voters possibly disenfranchised by an election irregularity is sufficient to affect the election outcome."  *Garda CL Atl., Inc.*, 356 NLRB 594, 594 (2001) (citation omitted).  There is, however, no "per se rule that representation elections must be set aside following any procedural irregularity."  *St. Vincent Hosp., LLC*, 344 NLRB 586, 587 (2005) (quoting *Rochester Joint Bd. v. NLRB*, 896 F.2d 24, 27 (2d Cir. 1990)).  Rather, although some eligible voters may have been unable to vote, the Board will certify the results of an election where the employees received "adequate notice [of] and opportunity to vote" in the election, and they were "not prevented from voting by the conduct of a party or by unfairness in the scheduling

17

or mechanics of the election." *Lemco Constr., Inc.*, 283 NLRB 459, 460 (1987). Consistent with the foregoing, "[w]hen an employee does not vote for reasons that are beyond the control of a party or the Board . . . the failure to vote is not a basis for setting aside the election." *Waste Mgmt. of Nw. La., Inc.*, 326 NLRB 1389, 1389 (1998). *See also Antelope Valley*, 275 F.3d at 1094 n.8 (citing *Waste Mgmt.* and applying foregoing principle).

Furthermore, established Board precedent holds that late-arriving ballots (i.e., arriving after the official vote count) or ballots otherwise "lost through the vagaries of mail delivery," are not a basis for overturning an election, even though the number of late or lost ballots may be determinative. *Classic Valet Parking, Inc.*, 363 NLRB 249, 249 (2015) (quoting *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 855 (5th Cir. 1978)). *See also Antelope Valley*, 275 F.3d at 1095-96 (acknowledging principle that ballots lost due to vagaries of mail does not require sustaining election objection). With respect to late mail ballots in particular, the Board has explained that its procedure already includes a grace period—accepting ballots arriving after the due date but before the scheduled vote count—and that the "substantial policy considerations favoring finality of election results" weigh against deferring those results for a potentially lengthy period as "mail ballots trickle into the regional office." *Classic Valet*, 363 NLRB at 249. Deferring finality, moreover, would run counter to the equally "strong policy considerations

18

favoring prompt completion of representation proceedings." *Versail Mfg., Inc.*,

212 NLRB 592, 593 (1974).

> **3.** **Objection 1: employees had adequate notice of, and opportunity to vote in, the election and were not prevented from voting by the Region or by any unfairness in the election's scheduling or mechanics**

Based on the record, and consistent with precedent, the Board acted within

its discretion when it overruled the Company's first objection, which alleged that

delays with the Region's processing of ballots and the Postal Service's delivery of

mail resulted in outcome-determinative voter disenfranchisement.  In rejecting that

objection, the Board found no merit to each of the Company's three supporting

arguments because, as discussed below, employees had adequate notice of and

opportunity to vote in the election and they were not prevented from voting by

either the Region's conduct or by any unfairness in the election's scheduling or

mechanics.[5]

> **a.** **The Company consented to a mail-ballot election**

The Board first found no merit to the Company's overarching claim (Br. 33,

39-40) that the Region bore responsibility for delayed ballots because at the time it

_____

[5] The Company agrees that these principles, as articulated in *Lemco*, are the appropriate analysis for Objection 1 (Br. 35), but it goes on to cite (Br. 35-36) the reasonable-doubt standard.  As discussed below (pp.31-32), that standard applies to objections, such as Objection 2, premised on alleged misconduct by a regional office or its agent and thus it is inapplicable here.

refused to conduct any manual (i.e., in-person) elections.  (HOR 8, DCR 2-3.)  As the Board acknowledged, "Region 13, like all NLRB regions across the country, ha[d] conducted a majority of representation elections by mail ballot" after the onset of the COVID-19 pandemic.  (DCR 2-3.)  However, if there was a disagreement over whether to hold an in-person election or instead utilize mail ballots, then the Board's regional offices resolved the issue pursuant to the guidelines set forth in *Aspirus Keweenaw*, 370 NLRB No. 45, 2020 NLRB LEXIS 541 (Nov. 9, 2020).  (DCR 3.)

In pressing its objection, however, the Company "fails to acknowledge" that it signed a stipulated election agreement "consenting to a mail ballot election." (DCR 3; MSJ Ex. 2.)  In other words, although it had "the opportunity to make arguments regarding the appropriateness of a manual election in a pre-election hearing," which would have "require[d] the Region to determine whether such election should be held under *Aspirus*," it failed to do so.  (DCR 3.)  Consequently, the use of mail ballots was the parties' choice and not, as the Company maintains (Br. 33, 39-40), because the Region made that determination under *Aspirus*. Because the Company voluntarily agreed to conduct the election by mail ballot, the Board reasonably "fail[ed] to see" how the Region bore responsibility for delays typically associated with that method.  (DCR 3.)  *See generally T&L Leasing*, 318

20

NLRB 324, 325 (1995) ("The Board has long held that election agreements are 'contracts,' binding on the parties that executed them.").

> **b.    The late arrival and untimely return of Wratten's duplicate ballot do not warrant setting aside the election**

The Board next found no merit to the Company's argument (Br. 33-38) specifically faulting the Region and a Board agent for the delays associated with Wratten's duplicate mail ballot.  (HOR 8-9, DCR 3-5.)  To the contrary, as shown below, the "record evidence does not establish that the late arrival or untimely return of Wratten's ballot can be attributed to Region 13's conduct, an election irregularity, or unfairness in the scheduling or mechanics of the election."  (HOR 8.)

With respect to the arrival of Wratten's duplicate ballot kit, the Board found no basis for the Company's assertion (Br. 33, 34) that Region 13's insufficient telephone coverage made it difficult for voters, such as Wratten, to request duplicate ballots.  (HOR 8, DCR 3-4.)  Initially, the record indicates that Wratten's original mail ballot kit was not delivered to her because she admittedly failed to provide her new address to the Company, which resulted in the Company providing Region 13 with an out-of-date address to use when mailing her ballot. (HOR 8; Tr. 43-44.)  Notwithstanding her oversight, the official notice of election listed two telephone numbers that voters were instructed to call to request duplicate

ballots—a number for Region 13 and a national toll-free number for the Board.
(DCR 3; JTX 3.)  On March 3 and 4, Wratten called both telephone numbers to
request a duplicate ballot kit, but she admitted to not leaving voicemail messages
when her calls went unanswered.  (HOR 8, DCR 3; Tr. 45-46.)

Instead of following the prescribed process for requesting a duplicate mail
ballot, Wratten ultimately called the cellphone number of a Region 13 Board agent
and left a voicemail requesting a duplicate ballot be sent to a new address.  (DOR 1
n.4; Tr. 44-47, 56-57.)  Afterward, though, Wratten "missed multiple return phone
calls" from Region 13 and, despite knowing the calls were from the Region, she
never responded because she was "busy with school and work."  (DCR 3-4; Tr. 47-
48, 51, 58.)  Following those unanswered calls, on March 10 the Board agent
mailed a duplicate ballot kit to Wratten.  That same day, the Board agent took the
extra step of sending a text message to Wratten advising that the duplicate ballot
was in the mail.  Wratten received the duplicate ballot kit on March 15 and that
same day the Board agent—once again going above and beyond—sent a text
message to Wratten to confirm she received it.  (HOR 8, DCR 4; ER 1, Tr. 53, 60.)

Based on the evidence, the Board found that "the Region's actions in
sending out Wratten's duplicate ballot kit did not constitute a 'multi-day delay'
which 'created the possibility of disenfranchisement' or raised any 'doubt as to the
fairness and validity of the election,'" as the Company maintained.  (DCR 4.)

22

Although there was an interval between Wratten's first telephone call to the Region (March 3) and when the Region mailed her duplicate ballot (March 10), this was not "a situation where the [Region] was derelict in not responding to Wratten for seven days." (DCR 4.) As the record shows, Wratten never left a voicemail message when she made her initial March 3 and 4 calls to the prescribed telephone numbers for requesting a duplicate ballot kit, and then, after leaving a voicemail of the Board agent's cellphone, she knowingly ignored the Region's "numerous attempts" to contact her over the following days.[6] (DCR 4-5.) In the end, "whether by request or its own initiative," the Region sent a duplicate ballot kit to Wratten, which "she acknowledged she received well before the date of the ballot count." (DCR 5.) Given these "specific circumstances," the Board reasonably concluded that "the Region's actions were both timely and reasonable" and did not "cause an irregularity or unfairness in the scheduling or mechanics of the election." (DCR 4.)

As for the return of her ballot, the Board found, and the record shows, that "Wratten's delay in returning her mail ballot . . . was beyond the control of the Region and does not provide a basis for setting aside this election." (DCR 4.) Here, it is undisputed that Wratten received her duplicate ballot kit on March 15,

---

[6] The Company's timeline (Br. 37) conveniently omits where Wratten left her message and her repeated failure to respond to the Region's telephone calls.

23

waited three more days until March 18 to mail her ballot back to the Region, and

the Region received her duplicate ballot on April 1, one day after the official vote

count.  (DCR 4.)  As the Board reasoned, "Wratten could have expeditiously

returned her mail ballot on March 15, the same day it arrived, or on March 16, the

day she told the Board [a]gent she would return it," but instead she inexplicably

waited until March 18.[7]  (DCR 4.)  Thus, the untimely return of Wratten's ballot

was due to "a delay . . . solely on her part, and not due to any action by the

Region."  (DCR 5.)

An eligible voter like Wratten, "having been advised of the procedure and

timing of the vote, maintains some responsibility for overcoming obstacles and

casting a ballot."  (DCR 4 (citing *Versail*, 212 NLRB at 593 (employee's inability

to vote not basis to set aside election where he chose to spend an additional day

during a work trip on a "personal frolic" and lost another day trying to locate

missing trailer he left attended)).)  The Board's decision not to set aside the

election on account of Wratten's late ballot is consistent with that principle as well

---

[7]  Notably, while Wratten held onto her ballot she would (or should) have known
that it had to be received by Region 13 before 10:00 a.m. on March 22, the original
deadline listed on the notice of election that Wratten's testimony indicates she saw
posted at work.  (JTX 3, Tr. 45-46, 56.)  Seeking to minimize her delay, the
Company emphasizes (Br. 38) that Wratten mailed her ballot "thirteen days prior
to the ultimate ballot count," but the parties' stipulated agreement to postpone the
count was entered on March 19, the day after Wratten mailed her ballot.  (JTX 4-
5.)  Thus, when Wratten finally mailed her ballot, it was due a mere four days later.

24

as prior decisions upholding mail-ballot elections in the face of objections premised on late-arriving ballots. *See, e.g.*, *Nat'l Van Lines*, 120 NLRB 1343, 1346 (1958) (overruling objection based on six late ballots where voters' failure to cast valid ballots was not "due to any defect in the election procedures utilized, but rather was occasioned by their lack of diligence and interest in mailing their ballots on a date which would have assured their timely receipt"). Indeed, given the undisputed fact that Wratten's ballot arrived just one day late, and the admission that Wratten herself was (Br. 37) "solely responsible" for three days' worth of delay, the Company effectively concedes her responsibility for the untimely return of her ballot.

### c.  Problems with mail delivery do not warrant a new election

Lastly, the Board found no merit to the Company's argument (Br. 39-41) that the "general failures" of the Post Office as it relates to the ballots of Wratten, Kaplan, and Coffman requires a new election. (HOR 9.) The undisputed evidence, the Board acknowledged, showed that: Wratten mailed her duplicate ballot to the Region on March 18 and the Region received it 14 days later, on April 1; Kaplan mailed her ballot to the Region on March 8 and the Region never received it; and Coffman never received his ballot kit that the Region mailed on February 25. (HOR 9, DCR 5.) Under well-established Board law, however, none of those errant ballots, though unfortunate, dictate that the election must be set aside.

25

With respect to Wratten and Kaplan, the Board "must balance the conflicting interest of affording employees the broadest participation in election proceedings while still insuring the prompt completion of election proceedings."  (DCR 6.)  The Board has found "a balance between th[ose] interests" by accepting ballots that arrive after the specified due date, but excluding any ballots that arrive after the official count.  (DCR 6 (citing *Classic Valet*, 363 NLRB at 249).)  *See NCR Corp. v. NLRB*, 840 F.3d 838, 844 (D.C. Cir. 2016) (rejecting challenge to Board's reasonable, chosen balancing of interests).  As discussed, that practice is premised on "substantial policy considerations favoring finality of election results," *Classic Valet*, 363 NLRB at 249, as well as "strong policy considerations favoring prompt completion of representation proceedings," *Versail*, 212 NLRB at 593.

Applying those principles to the facts, the Board reasonably found that "[s]ustaining the [Company's] Objection regarding the ballots of Kaplan and Wratten would open the door to endless challenges and litigation arising from varying experiences with the [Postal Service] and the subjective expectations of individual voters whose ballots arrived and/or were returned late."  (DCR 6.)  Counting ballots "received days after the count" or "not at all" would "improperly and unnecessarily shift the balance of the conflicting interests . . . against the prompt completion of election proceedings and unduly hamper and delay the entire election process."  (DCR 6.)  *See NCR*, 840 F.3d at 844 (lack of definitive deadline

would "require ballots to be counted regardless of when they were actually received, even if weeks or months after the scheduled date of the count had passed").  Instead, Wratten's tardy ballot and Kaplan's seemingly mislaid ballot fall within the recognized category of ballots "lost through the vagaries of mail delivery" that, while regrettable, do not require the Board to set aside an election, even if the ballots may have been determinative.  (DCR 6 (citing cases).)  *See, e.g.*, *NCR*, 840 F.3d at 840, 844 (affirming Board decision to exclude seven late ballots even though they may have been determinative); *Classic Valet*, 363 NLRB at 249 (excluding 10 possibly determinative mail ballots that arrived after official count); *Premier Util. Servs., LLC*, 363 NLRB 1524, 1524 n.1 (2016) (excluding "many" untimely mail ballots that could have been determinative).

Thus, as the Board concluded, "extant Board law" does not require setting aside this mail ballot election when just two or three ballots out of the whole eligible-voter pool were late or lost.  (DCR 6.)  The Company's emphasis (Br. 39) on "nearly ten percent" of ballots being impacted by delivery issues is of no moment.  While the Board does not rely on voter participation percentage rates to assess an election's validity (DCR 3), the 72 percent response rate (21 returned ballots out of 29 eligible voters) in this election accords with other Board mail-ballot decisions upheld by the Court.  *See NCR*, 840 F.3d at 843 (76 percent participation rate undercut employer's argument mail ballot election was invalid

27

due to lost ballots); *Antelope Valley*, 275 F.3d at 1095-96 (employer's challenge to Board's conducting of mail ballot election undercut by 66 percent response rate).

As for Coffman's failure to receive a mail ballot kit, he "was aware that . . . an election was taking place" and, like all eligible voters, had received instructions "regarding the procedure for requesting a duplicate ballot in the event an original ballot was not received."  (DCR 5.)  *See Lemco*, 283 NLRB at 460 (Board examines whether eligible voter had "adequate notice [of] and opportunity to vote" in the election).  "Despite receiving those instructions, Coffman undisputedly did not call or otherwise initiate any contact with [the] Region 13 office to seek a duplicate ballot."[8]  (DCR 5.)  Having been so advised, established precedent provides that Coffman thus bore "some responsibility for overcoming obstacles and casting a ballot."  (DCR 5 (citing *Versail*, 212 NLRB at 593).)

Based on the foregoing, the Board found that Coffman "clearly" fell into the category of cases where a voter's "failure to return a ballot whatsoever was beyond the control of the parties or the Board" and, therefore, was "not a basis for setting aside an election."  (DCR 5.)  *See Waste Mgmt.*, 326 NLRB at 1389 (articulating principle).  In similar circumstances where four eligible voters failed to receive

---

[8]  When asked, "just to be clear, you never made any attempt whatsoever to receive a ballot as far as contacting" Region 13, Coffman replied "[n]ope." (Tr. 74.)  As Coffman explained, he was just "too busy" to do so.  (Tr. 75.)

their mail ballot kits, the Court affirmed the Board's overruling of the employer's election objection because the voters had an adequate opportunity to request duplicate ballots but failed to take advantage of it. *See Antelope Valley*, 275 F.3d at 1091-95.

### d.     The Company's remaining challenges are unavailing

### i.     *National Hot Rod* is not controlling

The Court's decision in *National Hot Rod Association v. NLRB*, 988 F.3d 506 (D.C. Cir. 2021), relied on by the Company (Br. 36-37), does not dictate that the Board erred in overruling Objection 1. There, the Court held, based on the unique record in that case, that the Board was at fault for an employee's inability to vote in a one-vote-margin election. *Id.* at 507-09. The record in *National Hot Rod*, however, differs from this case in several key respects.

There, on the Wednesday before Thanksgiving, the eligible voter called the regional office's telephone number listed on the notice of election and, when no one answered, he left two voicemails requesting a duplicate ballot. *Id.* at 508. The following Friday he left another voicemail making the same request. *Id.* Receiving no response to his three voicemails, the employee directly contacted a Board agent the following Monday—five days after his first voicemail—to again request a duplicate ballot, which the regional office then mailed to him. *Id.* The employee subsequently received both his original and duplicate mail ballots, but

29

days after the regional office had counted the ballots.  *Id.*  Duplicate ballots mailed to other voters on Wednesday (the day the employee made his first request) were received by those voters in time to return them to the regional office to be counted. *Id.* at 509-10.  Based on that case-specific evidence, the Court concluded that the regional office's failure to respond to the ballot request for five days was an election irregularity that disenfranchised the employee from casting a possibly determinative vote.  *Id.* at 507, 509.

Here, by contrast, Wratten never left any voicemails when she called the telephone numbers on the notice of election.  And after finally leaving a message on the Board agent's voicemail, Wratten repeatedly ignored the Region's attempts to contact her over several days.  Finally, and significantly, Wratten received her duplicate ballot before the Region counted the ballots and thus she had the opportunity to timely return it but waited an additional three days before mailing it. Accordingly, the significant facts at play in *National Hot Rod* are absent from the present case, where the voter's role in the delay is significant.  Moreover, the Board agent here took extra steps to ensure Wratten received her duplicate ballot compared with the regional office's handling of the voter's request in *National Hot Rod.*  Accordingly, the Company's claim (Br. 25) that the two cases are "virtually identical" is unfounded.

### ii. The Company's voicemail-related claims are misplaced or jurisdictionally barred

The Company incorrectly states (Br. 34) that the Board "failed to review and correct a basic factual error," namely, that Wratten did leave a voicemail. The Company, however, overlooks the Board's Decision on Review and Order, which addressed the Company's request for review. There, the Board found that, although "not discussed by the Hearing Officer or Acting Regional Director, the record supports the conclusion that Wratten . . . called the Board agent's cellphone in the beginning of March [and] left a voicemail stating that she needed a duplicate ballot at a new address." (DRO 1 n.4.) Thus, consistent with that finding, Wratten's voicemail started the ball rolling as the Board agent repeatedly called her back (without Wratten responding) and ultimately mailed the duplicate ballot kit to Wratten, complete with confirmation by text message.

To the extent the Company further maintains (Br. 34-35) that the Board's resolution of the issue insufficiently addressed its concerns, it should have raised that contention in a subsequent motion for reconsideration in the representation case. *See* 29 C.F.R. § 102.65(e)(1)-(2) (providing for motions for reconsideration). Because the Company failed to do so, the Court lacks jurisdiction to consider that contention now. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.");

*Pace Univ. v. NLRB*, 514 F.3d 19, 24 (D.C. Cir. 2008) (citing § 160(e)) ("a representation issue not previously litigated [before the Board in the representation case] is not properly before the court upon a petition for review of an order in the unfair labor practice proceeding.")

### C.    The Board Acted Within Its Wide Discretion in Overruling Objections 2, 4, and 5

The Board also acted within its wide discretion when it overruled the Company's election objections alleging that a Board agent misrepresented the status of Wratten's mail ballot (Objection 2), and that the Region unilaterally forced the postponement of the ballot count (Objection 4) and failed to issue an amended notice of election (Objection 5.)  As discussed below, ample evidence and precedent support the Board's finding that the Company failed to carry its heavy burden of proving objectionable conduct by the Board agent or Region.

### 1.    Applicable principles

Where, as here, a party disputes the outcome of an election based on the allegedly improper conduct of the Board's regional office or its agent, the Board examines "whether the alleged irregularity raise[s] 'a reasonable doubt as to the fairness and validity of the election.'"  *Guardsmark, LLC*, 363 NLRB 931, 934 (2016) (quoting *Polymers, Inc.*, 174 NLRB 282, 282 (1969)).  *Accord Am. Bottling Co. v. NLRB*, 992 F.3d 1129, 1140 (D.C. Cir. 2021).  To carry its burden under the reasonable-doubt test, an objecting party's "showing of prejudicial harm must be

more than speculative to establish that a new election is required." *Guardsmark*,

363 NLRB at 934.  *Accord Durham Sch. Servs., LP v. NLRB*, 821 F.3d 52, 61

(D.C. Cir. 2016).

> **2.    Objection 2: the Board agent's email to the parties did not raise a reasonable doubt as to the election's fairness and validity**

> **a.    Additional relevant facts**

As discussed, on March 19 the parties agreed to extend voting and postpone

the ballot count out of a concern that the Region had not received all of the ballots

mailed back to it.  On March 22, the Board agent provided the parties with a status

update.  She wrote:

> Happy Monday!  Wanted to let you both know that the 3 ballots I had
> been expecting plus a couple more came in to our office late Friday.
> So we've received ballots from all at least that have told me that they
> sent their ballots in.  We are at about 20 received as of this past
> Friday.  Thus, I'd expect we'll be going forward with the count on
> 3/31.

(DRO 1; JTX 7.)

The March 31 ballot count showed a Union victory.  Afterward, a company

representative emailed the Board agent to request that she preserve all late-arriving

ballot envelopes and notify the parties if any arrived.  (DRO 1; JTX 10.)  In her

response later that evening, the Board agent agreed to the request and further added

that:

> As you both know, as of Thursday 3/18 before the original count scheduled on 3/22, there were 3 voters that had separately informed me they mailed their ballot but we had not received them at my office. That led us to reschedule the count. Those 3 voters' ballots were then received the following day, on Friday 3/19. Thus, we received a ballot from each voter that had contacted me.

(DRO 1; JTX 10.)

Wratten's ballot arrived at Region 13 on April 1, the day after the count.

The next day, the Board agent notified the parties that the Region had received

Wratten's ballot. She explained that the Region had sent a duplicate ballot to

Wratten on March 10 at her request and that the return postmark was dated March

18. (DRO 1; JTX 10.) The Board agent went on to write that:

> While she contacted me to request the duplicate, she did not request that I confirm we received her ballot, so she was not "on my radar" to contact upon receiving her ballot. In any event, I'd like to clarify my statement [in the March 31 email], "we received a ballot from each voter that had contacted me," such that we received a ballot from those that contacted me to ask that I confirm when their ballot has been received by my office. Of the remaining voters whose ballots we have not received (I believe there are 8), I did not receive any contact from them to request a duplicate ballot or otherwise concerning this election.

(DRO 1; JTX 10.)

> **b.    The Company failed to prove that the agent's alleged misrepresentation raised a reasonable doubt as to the election's fairness and validity, and it proffered only speculative harm**

In considering the Company's objection, the Board first "assum[ed], without

deciding, that the Board [a]gent's March 22 email misled the parties because it

gave the incorrect impression that the Region had received all the outstanding ballots that had previously led the parties (and the Acting Regional Director) to agree to extend the voting period and the ballot count . . . ."  (DRO 2.)  Even then, the Board reasonably found that the "alleged misrepresentation d[id] not raise a reasonable doubt as to the fairness and validity of the election."  (DRO 2.)

"To the extent that the alleged misrepresentation deprived the [Company] of the opportunity to seek a second extension of the ballot count," the Board found that "ultimately irrelevant" to the dispositive question: "whether the voting itself was valid."  (DRO 2.)  Here, there was "no showing" by the Company that the Board agent's email "affected the ability of any employees to receive their ballots and cast their votes."  (DRO 2.)  Indeed, it is indisputable that "[n]o voters were aware" of the agent's email and that Wratten had already mailed her ballot back to the Region by the time the agent sent the March 22 email.  (DRO 2.)  Therefore, "nothing alleged in Objection 2 hindered the casting of any votes or otherwise undermined the integrity of the election process . . . ."  (DRO 2.)

Furthermore, the Board found that "the effect of the Board [a]gent's alleged misrepresentation [was] speculative."  (DRO 2.)  As discussed (pp.31-32), to prevail on an objection based on the conduct of a Board agent, it is well established that an objecting party must prove not only that the conduct raised a reasonable doubt about the election's fairness and validity, but it "must put forward evidence

of actual prejudice" that is "more than speculative."  (DRO 2 (citing *Guardsmark*,

363 NLRB at 934).)  Here, "[e]ven assuming" that the Company would have

sought a second extension had the Board agent referenced Wratten's outstanding

ballot, and assuming even further that the Union would have agreed to a second

extension, the Board found that the Acting Regional Director "was under no

obligation to grant a second extension."  (DRO 2.)

Specifically, the parties' stipulated election agreement provided that "[i]f the

election and/or count is postponed or canceled, the Regional Director, in his or her

discretion, may reschedule the date, time, and place of the election and/or count."

(JTX 2.)  By agreeing to extend voting and postpone the ballot count in their

March 19 stipulated agreement, the parties triggered that provision.  Thus, "any

rescheduling of the count was within the [R]egional [D]irector's discretion."

(DRO 2 n.5.)  In keeping with that discretion, it would not have been an abuse of

discretion for the Acting Regional Director to deny a request for a second

extension given the then-known facts:  "one possibly outstanding ballot the voter

purportedly placed in the mail 2 weeks before."  (DRO 2.)  Accordingly, because

the Acting Regional Director may very well have properly exercised his discretion

to deny a second extension request, the Company cannot show any non-

speculative, actual prejudice owing to the Board agent's alleged misrepresentation.

"Under these circumstances," principally no evidence that voters were hindered from voting and the asserted harm being speculative, the Board properly found that the Board agent's alleged misrepresentation "did not raise a reasonable doubt as to the fairness and validity of the election." (DRO 2.) That finding, although by its nature fact-specific, falls comfortably within the body of prior decisions overruling objections to alleged regional or Board agent misconduct.

For instance, in *American Bottling*, the Court agreed that the employer failed to prove the agent's alleged misconduct—refusing to allow challenges to the ballots of certain employees previously determined to be eligible voters—raised a reasonable doubt as to the election's fairness and validity. 992 F.3d at 1140-41. Although the employer claimed changed circumstances with respect to their eligibility, its supporting evidence was a mere "general assertion" about a supposed upcoming reorganization. *Id.* at 1141. Similarly, in *American Medical Response*, the agent's alleged misconduct—setting up the polling area in a manner that compromised the secrecy of voting—did not raise a reasonable doubt. 356 NLRB 199, 199-200 (2010), *enforced*, 477 F. App'x 743 (D.C. Cir. 2012). The agent had utilized a Board-sanctioned booth and the employer offered no proof that voters' ballots were, in fact, seen. *Id.* And in *Guardsmark*, the region's alleged misconduct—sending mixed-messages about whether the employer could hold a last-minute mass meeting to remind voters when ballots would be mailed—also did

not raise a reasonable doubt.  363 NLRB at 934.  The employer could have held

the meeting earlier, voters were already informed when ballots would be mailed,

and the employer offered only speculation that low voter turnout was due to it

being prevented from reminding them about the ballot mailing date.  *Id.* at 934 &

n.14.

> **c.** **The Company's two-fold challenge to the Board's application of the reasonable-doubt test is meritless**

Challenging the overruling of its objection, the Company asserts that the

Board erred by, first, applying the reasonable-doubt test and requiring more than

speculative prejudicial harm and, second, not sustaining the objection under a

separate line of case law.  There is no merit to either assertion.  As to the

Company's first challenge (Br. 24-30), as discussed (pp.11-14), it is well

established that the party seeking to overturn a representation election bears a

heavy burden—a principle the Company never addresses, let alone disputes.

Consistent with that heavy burden, when a party seeks to overturn an election

based on allegations ascribing misconduct to agency personnel, it is eminently

reasonable for Board precedent to require the party to establish that the conduct

raised a reasonable doubt about the election's fairness and validity and to

demonstrate non-speculative prejudicial harm.

Both requirements, moreover, have met with the express approval of this

Court.  Thus, where "objections are based on the alleged conduct of the Board's

38

agent," the Court has held that the "election will be overturned only if the objections raise a 'reasonable doubt' as to its fairness and validity." *Am. Bottling*, 992 F.3d at 1140 (quoting *Polymers*, 174 NLRB at 282).  As to the objecting party's evidentiary burden, the Court has held that "[w]hen the conduct of a Board Agent is at issue, one substantive criterion is that 'mere speculative harm [is insufficient] to overturn an election.'" *Durham Sch. Servs.*, 821 F.3d at 61 (alteration in original) (quoting *Fresenius USA Mfg.*, 352 NLRB 679, 680 (2008)). Therefore, consistent with the Company's claim that the Board agent misrepresented the status of Wratten's ballot, the Board reasonably analyzed Objection 2 as alleging agent misconduct—the same descriptor used by the Company (Br. 24, 31, 35, 47)—and applied the foregoing requirements.

Seeking to avoid the applicability of these requirements, the Company emphasizes its objection claimed that "disenfranchisement" resulted from the agent's misrepresentation.  (Br. 24, 29, 30.)  However, the fact that a misconduct-based objection also claims resulting voter disenfranchisement does not render inapplicable the reasonable-doubt test or the necessity of proving non-speculative prejudice.  *See, e.g.*, *Guardsmark*, 363 NLRB at 934 & n.14 (applying reasonable-doubt test and requiring non-speculative proof of prejudice even though employer claimed voter disenfranchisement resulted from regional misconduct); *Magnum Transp., Inc.*, 360 NLRB 1093, 1093 n.3, 1095-96 (2014) (same in case alleging

Board agent misconduct); *Patient Care of Pa., Inc.*, 360 NLRB 637, 637 (2014)
(same).

Disagreeing with the burden placed on it, the Company also repeatedly
mentions needing to show just "possible" voter disenfranchisement.  (Br. 24, 25,
26, 27, 29.)  However, that showing applies to objections, such as Objection 1,
where the allegation entails employees being "prevented from voting by the
conduct of a party or by unfairness in the scheduling or mechanics of the election."
*Lemco*, 283 NLRB at 460.  *See* pp.16-18.  As just discussed, it is not the governing
standard for agent-misconduct objections.  More broadly, the Company
misapprehends the Board's decision (Br. 24, 28-30), which did not require it to
show (Br. 24) "*actual* disenfranchisement."  Instead, the Company's burden was to
prove non-speculative prejudice due to the agent's failure to mention Wratten's
outstanding ballot.  Its asserted prejudice—the inability to seek a second extension,
which would have made Wratten's ballot timely—was entirely speculative, as
shown (pp.34-35), and its quibbling (Br. 29-30) with that finding serves to merely
reinforce it.  (Br. 29 ("direct, potential casual line," "irregularity possibly resulted
in disenfranchisement"), Br. 30 ("Region *could* have granted second extension").)

The numerous cases cited by the Company (Br. 24-27) to support its
contentions are unavailing; unlike Objection 2, none of them analyze objections
based on alleged misconduct by a Board regional office or agent.  For instance,

several of the cases involve regional offices' failure to (timely) send ballots (or

duplicate ballots) to voters, which implicates the *Lemco* analysis above involving

Objection 1—*i.e.*, whether employees were prevented from voting by a party's

conduct or by unfairness in the election's scheduling or mechanics.  *See Nat'l Hot*

*Rod*, 988 F.3d at 508-09; *Oneida Cnty. Cmty. Action Agency, Inc.*, 317 NLRB 852,

852 (1995); *Davis & Newcomer Elevator Co.*, 315 NLRB 715, 715 (1994); *Star*

*Baking Co.*, 119 NLRB 835, 835-36 (1957); *N. Am. Aviation, Inc.*, 81 NLRB 1046,

1047-49 (1949).  Other cases address the factually and legally distinct situation

where, during manual elections, Board agents either closed the polls or failed to

open them when they were scheduled to be open.  *See Garda*, 356 NLRB at 594;

*Wolverine Dispatch, Inc.*, 321 NLRB 796, 796-97 (1996); *G.H.R. Foundry Div.,*

*Dayton Malleable Iron Co.*, 123 NLRB 1707, 1708-09 (1959).

The Company fares no better with its second challenge, that the Board erred

by not sustaining its objection under *Athbro Precision Engineering Corp.*, 166

NLRB 966 (1967).  (Br. 30-33.)  The Board's *Athbro* "test applies to conduct that,

for example, may undermine the Board's appearance of neutrality," (DRO 2 n.6),

or "which tends to destroy confidence in the Board's election process," *Athbro*,

166 NLRB at 966.  Based on the evidence, the Board reasonably found the

objection did not involve conduct that "could reasonably be interpreted as

impairing the election standards the Board seeks to maintain" (i.e., its neutrality),

or that "tends to destroy the confidence in the Board's election process." (DRO 2 n.6.) With regard to the former, "[n]othing in the Board [a]gent's communications here impugned the Board's neutrality" (DRO 2 n.6), as the record plainly reveals. *See* pp.32-33. As for the latter, the agent's "alleged misrepresentation concerning the status of a single outstanding ballot [would not] tend[] to destroy the confidence in the overall election process." (DRO 2 n.6.) Because the agent's conduct fell short of implicating the concerns set forth in *Athbro*, the Board reasonably declined to sustain the objection under that test. *See Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D. C. Cir. 2006) (Court has "repeatedly held" that an "agency's interpretation of its own precedent is entitled to deference.") (quoting *Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998)).

Quarreling with the Board's judgment, the Company claims (Br. 32) it is contrary to "precedent." However, it cites cases (Br. 31-32) involving distinguishable problematic conduct, namely, Board agents mishandling completed ballots. *Concrete Express of NY, LLC*, 368 NLRB No. 135, 2019 NLRB LEXIS 688, *2 (Dec. 10, 2019) (remanding for hearing the allegation a Board agent improperly failed to secure potentially determinative challenged ballot and, while in possession of ballot, accepted ride from polling site with union officials); *Jakel, Inc.*, 293 NLRB 615, 616 (1989) (Board agent opened and reached into ballot bag in effort to remove mistakenly deposited challenged ballot, and it could not "be

determined with reasonable accuracy whose ballot was extracted from the ballot bag"). Other cited cases involve misconduct but not an *Athbro* analysis. *Paprikas Fono*, 273 NLRB 1326, 1326-28 (1984) (where agent and regional office mishandled challenged ballots, the Board, applying *Polymers*, found conduct raised a reasonable doubt as to the election's fairness and validity); *Austill Waxed Paper Co.*, 169 NLRB 1109, 1109 (1968) (Board overturned election where ballot box left unattended up to five minutes, citing practice of setting aside elections if there is any doubt as to ballot box's integrity). Accordingly, the Company offers no relevant authority to support its claim that the Board erred by not sustaining Objection 2 under *Athbro*.

### 3. Objection 4: the Region postponed the ballot count based on the parties' agreement

In its fourth objection, the Company alleged that the Region unilaterally forced the postponement of the ballot count from March 22 until March 31. The Company mentions the objection in the portion of its opening brief devoted to the statement of the case (Br. 4-5, 8, 15, 17), but otherwise presents no argument supporting the objection.[9] Accordingly, the Company has waived any challenge to the Board's overruling of Objection 4. *See NY Rehab. Care Mgmt., LLC v. NLRB*,

---

[9] To the extent the Company is relying on the arguments in its brief's final section (Br. 47-48) to preserve this objection, they fail to do so for the reasons discussed below (pp.51-54).

43

506 F.3d 1070, 1076 (D.C. Cir. 2007) (arguments not made in opening brief are waived).  In any event, as briefly discussed below, the Board acted within its discretion when it overruled the objection.  (HOR 14, DCR 8-9.)

As shown (p.5), the Acting Regional Director postponed the ballot count "per the parties' Stipulated Agreement to postpone the ballot count."  (DCR 9; JTX 5.)  That agreement referenced their "concern that not all mail ballots mailed back to the Regional Office ha[d] been received," and it noted that only 15 of 30 mail ballots were received as of March 19.  (DCR 9; JTX 4.)  Because "the postponement was *by agreement of the parties* and not ordered by the Regional Director," the Board found no support for the Company's assertion that the Region unilaterally forced the postponement.  (DCR 9 (emphasis retained).)

The Board also found no merit to the Company's related contention that the Acting Regional Director should have sua sponte ordered a second postponement based on Wratten's outstanding ballot.  (DCR 9.)  Here, the parties' stipulated election agreement specifically provided that, "[i]f the election and/or count is postponed or canceled, the Regional Director, *in his or her discretion*, may reschedule the date, time, and place of the election and/or count."  (DCR 9 (emphasis retained); MSJ Ex. 2.)  The record, however, did not compel the Acting Regional Director to exercise that discretion.

Specifically, the record revealed that the "first postponement served its purpose," namely, addressing the low voter participation by allowing more time for completed mail ballots to reach the Region.  (DCR 9.)  Conversely, the "record [did] not support the [Company's] assertion that a second postponement by the Regional Director would have been warranted" because of unreceived ballots.  (DCR 9.)  In fact, the record was devoid of "evidence showing a continued low participation rate" leading up to the March 31 ballot count: as of March 22, the Region had received approximately 20 completed mail ballots out of 29 eligible voters (JTX 7), with Wratten's being the only known and potentially outstanding mail ballot (DCR 9.)  Accordingly, the Board acted well within its discretion in overruling Objection 4.

### 4.    Objection 5: the absence of a new or amended notice of election—which was not required—did not raise a reasonable doubt as to the election's fairness and validity

The Board also acted within its wide discretion when it overruled the Company's fifth objection, which alleged that the Region erred by not issuing a new (or amended) notice of election reflecting the postponed ballot count.  (HOR 15, DCR 9-11.)  As discussed below, the existing notice was unquestionably valid, the Region's failure to issue a new or amended notice did not raise a reasonable doubt as to the election's fairness and validity, and there is no legal support for the Company's assertion that the Region was obligated to issue another notice.

First, the Board emphasized the following "undisputed" facts, which establish the uncontested (Br. 41-46) validity of the notice of election. (DCR 9.) After the parties signed the stipulated election agreement, Region 13 prepared a proper notice of mail ballot election and the Company timely posted the notice in the workplace. (DCR 9; JTX 3.) As relevant here, the notice informed employees that the Region would mail the ballots on February 25, 2021, and that the Region had to receive completed mail ballots before 10:00 a.m. on March 22, at which time the Region would count them. (JTX 3.) Thus, "employees received notice of the election and the [parties'] agreed upon procedures before the election took place." (DCR 9 (quoting HOR 15); Tr. 45-46, 56.) Based on the record, the Board found that the "notice of election issued per the procedures set forth in [Casehandling Manual] Section 11314," which contains detailed guidelines for the preparation, distribution, and posting of notices.[10] (DCR 9-10.) Accordingly, there was "no basis to set aside the election under [Section] 102.62(e)" of the

---

[10] NLRB Casehandling Manual (Part 2) § 11314.1-.7 (2020), *available at* https://www.nlrb.gov/guidance/key-reference-materials/guidance-documents-manuals (lasted visited June 20, 2023).

Board's Rules and Regulations, 29 C.F.R. § 102.62(e), as the Company urges (*see infra*).[11]  (DCR 10.)

Having determined that the notice of election was valid, the Board further found the "undisputed" facts establish that the Region did not engage in objectionable conduct by not issuing a new or amended notice.  (DCR 10.) Specifically, the parties executed a stipulated agreement in order to postpone the ballot count from March 22 until March 31 out of "a concern that not all mail ballots mailed back to the Regional Office ha[d] been received."  (DCR 10; JTX 4.)  Accordingly, the Region postponed the count but it did not issue a new or amended notice of election.  (DCR 10; JTX 5.)

As the Board found—and the Company apparently does not dispute (Br. 8, 41-46)—the "stated purpose of the [s]tipulated [a]greement was to address the parties' concern [and] to allow additional time for outstanding mailed ballots to arrive at the Regional Office, *not* to allow employees more time to mail their ballots."  (DCR 10 (emphasis retained).)  Thus, the express purpose of the

---

[11]  Section 102.62(e) provides in relevant part that, after approval of a consent or stipulated election agreement or the issuance of a direction of election, "the Regional Director shall promptly transmit the Board's Notice of Election to the parties and their designated representatives . . . ."  29 C.F.R. § 102.62(e). Thereafter, the "employer shall post and distribute the Notice of Election in accordance with § 102.67(k).  The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed . . . ."  *Id.*

47

extension (allowing in-transit ballots to reach the Region) is distinct from the

purpose of a notice in a mail ballot election, which defines the voting period so that

voters may judge when to mail their completed ballots to ensure receipt.  To be

sure, as an exercise of discretion the Region "might have, out of an abundance of

caution, issued a new or supplemental notice of election advising employees of

additional time to return their ballots . . . ."[12]  (DCR 10.)  However, on these facts,

the Region's "failure to do so did not raise a reasonable doubt as to the fairness and

validity of the election or affect the results of the election."  (DCR 10 (citing

*Guardsmark*, 363 NLRB at 934).)

Moreover, in addition to finding that the Region's conduct was not an

election irregularity, the Board found that the Company's required showing of

prejudicial harm was "decidedly speculative."  (DCR 10.)  Here, there was "no

evidence" that "any voters failed to vote because they did not think their ballot

would be returned to the Regional office on time" (DCR 10), or "were prevented

from voting because a new notice of election was not issued" (HOR 15).  Even as

to Wratten, she mailed her completed ballot on March 18, one day before the

---

[12]  There is no evidence that the parties contemporaneously asked the Region to
issue another notice of election, and the Company does not claim that it made such
a request.

48

parties agreed to postpone the ballot count.  (DCR 10.)  Thus, the absence of an

amended notice announcing that fact had no bearing on her ballot.  (DCR 10.)

The Company's challenges are legally and factually baseless.  Despite the

ink spilled, the Company cites "no authority" to support its novel assertion (Br. 42-

44) that "a Region engages in per se objectionable conduct when it fails to amend a

timely issued [n]otice of [e]lection."  (HOR 15.)  The Company (Br. 42-43)

heavily relies on Section 102.62(e), but the Board reasonably found that reliance

"misplaced."  (HOR 15.)  As discussed, the "undisputed" facts demonstrate the

existing notice of election complied with the requirements in Section 102.62(e) and

that employees received adequate notice of the election's details.  (DCR 9, HOR

15.)  The same undisputed facts—and the absence of any evidence that the notice

poster was removed prior to the election's end—show that the Company's reliance

(Br. 42-44) on Section 102.67(k), 29 C.F.R. § 102.67(k), which provides the

requirements for posting an election notice, is similarly misplaced.[13]  In short, the

---

[13]  Section 102.67(k) provides in relevant part that the employer "shall post copies
of the Board's Notice of Election in conspicuous places . . . at least 3 full working
days prior to 12:01 a.m. of the day of the election . . .  In elections involving mail
ballots, the election shall be deemed to have commenced the day the ballots are
deposited by the Regional Office in the mail.  In all cases, the notices shall remain
posted until the end of the election."  29 C.F.R. § 102.67(k).  "The employer's
failure properly to post or distribute the election notices as required herein shall be
grounds for setting aside the election whenever proper and timely objections are
filed . . . ."  *Id.*

Company fails to identify any language in Section 102.62(e) or Section 102.67(k) requiring a Region to issue an amended notice where, as here, the ballot count was postponed, such that the failure to do so constitutes (Br. 42) "*per se* objectionable conduct."

The Company's reliance (Br. 44) on Section 11314 of the Casehandling Manual—which it acknowledges is "not a legally binding document"—likewise fails to further its cause. Despite its claim (Br. 44) that the section "requires a [notice] to contain the date, time, and place where ballots will be mingled and counted," Section 11314 merely provides that the notice in mail ballot elections "*should* contain" that information. *See* NLRB Casehandling Manual (Part 2) § 11314.1 (2020) (emphasis added). As discussed, the existing notice of election was issued in conformity with Section 11314, including listing information about the ballot count, but there is no requirement—in the permissively worded Section 11314.1 or elsewhere—that obligated the Region to amend the notice to reflect the rescheduled ballot count. *Davis & Newcomer*, cited by the Company (Br. 44), is not to the contrary. Unlike here, sending a duplicate ballot to a voter who failed to sign his original ballot "[w]as required by the Board's casehandling procedures," and thus the failure to do so warranted setting aside a one-vote margin election. 315 NLRB at 715.

50

The remaining cases cited by the Company (Br. 45), which all concern defective or otherwise erroneous election notices, are plainly distinguishable on their facts.  *See Woods Quality Cabinetry Co.*, 340 NLRB 1355, 1355-56 (2003) (petitioning union not affiliated with AFL-CIO and parties had informed employees union not affiliated, but notice erroneously stated union was affiliated); *Rattan Art Gallery, Ltd.*, 260 NLRB 255, 255-57 (1982) (version of notice translated into Filipino dialect confusing and missing portion of standard language included on English version); *Walker Vehicle Co.*, 7 NLRB 827, 833 (1938) (notice's erroneous designation of petitioning union may have stigmatized it by indicating it was company-dominated union).

The Company fares no better with its closing arguments.  (Br. 45-46.)  It faults (Br. 45) the Board for applying the reasonable-doubt test and requiring non-speculative evidence of prejudicial harm, but as discussed (pp.31-32) that is the operative test where, as here, an objection alleges improper conduct by the Region.  Moreover, the Company proffers nothing but conjecture.  It posits that the failure to amend the notice "potentially" affected the election's outcome because it is "*possible*" that, if employees received the amended notice, then those who did not

51

cast ballots "may have voted."[14]  (Br. 45-46 (emphasis retained).)  Thus, the brief

merely reinforces the Board's finding that the Company offers "decidedly"

speculative evidence.  (DCR 10.)

### D.    The Company's Cursorily Briefed Claims About Access to Evidence Are Waived

In the final two pages of its brief, the Company presses what is essentially a

catch-all claim in support of its otherwise unproven objections: "[t]o the extent

necessary to resolve any of [the] objections, the General Counsel's denial of

testimony and documents warrants granting the petition for review."  (Br. 48.)  The

Company's arguments, however, are so cursory as to be waived.

Prior to the hearing on its objections, the Company submitted an extensive

seven-paragraph request to the Board's Acting General Counsel seeking certain

agency documents and the testimony of agency personnel.  (ER 2.)  On behalf of

the Acting General Counsel, the Regional Director for Region 7 granted, in part,

the request for documents "based on the relevance of the requested information to

---

[14]  Requiring an amended notice, as the Company advocates, would not necessarily improve voter participation.  The Company ignores that informing employees of a postponed count could result in employees further delaying the mailing of their ballots, such that more ballots arrive late and go uncounted.

the [o]bjections and the unavailability of this information from other sources."[15]
(ER 3.)

With respect to the request for the testimony of agency personnel, the
Regional Director denied it because such requests "are not granted absent the
presence of unusual circumstances."  (ER 3.)  As he explained, the "policy is
intended to avoid the appearance of partiality.  Unusual circumstances are not
present where other witnesses are available and the issues can be resolved through
credibility resolutions."  (ER 3.)  In support, the Regional Director cited *Laidlaw
Transit*, 327 NLRB 315, 316 (1998), where the Board reiterated its "strong and
longstanding policy against Board employees appearing as witnesses in Board
proceedings," absent unusual circumstances.  The Regional Director found no
unusual circumstances here because the objections could "be resolved through the
testimony of witnesses other than the Board [a]gent or any other [a]gency
personnel."  (ER 3.)  The Company neither disputes the application of *Laidlaw* nor
explains why other witnesses—like its representative who spoke with the Board
agent (Br. 4)—were insufficient.

---

[15]  Specifically, the Region would produce "the voter list used during the ballot
count and the Region's internal list showing the dates it received ballots and the
dates any duplicate mail-ballot kits were sent to voters," and Wratten's "late
arriving yellow mail-ballot envelope (both front and back) will be made available
for examination via video."  (ER 3.)

53

Under the Federal Rules of Appellate Procedure, the argument section of a brief must contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A).  The Company's brief falls short of that requirement. The Company, for instance, generally asserts (Br. 48) that "the evidence requested by [it] was objectively not capable of being obtained" through other witnesses' testimony, but it fails to clarify what specific evidence it is referring to.  Likewise, it makes the blanket claim (Br. 48) that the denial of its request "was contrary to Board precedent," without citing a single case in support.  More broadly, the Company makes no effort to explain what withheld evidence relates to which objection, or how such evidence would support any specific objection.[16]  In short, the Company's brief impermissibly "leav[es] the court to do counsel's work." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).  Accordingly, the Company has

---

[16]  To the extent the Company attempts to resuscitate its claim by pointing to other places where it discussed its request, those passages are inadequate because they are footnotes in the procedural history and facts sections of its brief (Br. 4 n.1, 8 n.5).  *See NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007) (arguments in footnotes "not enough to raise an issue for our review"); *United States v. Baugham*, 449 F.3d 167, 178 n.3 (D.C. Cir. 2006) (raising issue only in statement of facts insufficient to preserve it) (citing cases).

waived the claim that the denial of its request for documents and testimony

requires granting its petition.

# CONCLUSION

The Board respectfully requests that the Court enter a judgment denying the

petition for review and enforcing the Board's Order in full.

/s/ Usha Dheenan
USHA DHEENAN
*Supervisory Attorney*

/s/ Jared D. Cantor
JARED D. CANTOR
*Senior Attorney*

National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2948
(202) 273-0016

JENNIFER A. ABRUZZO
        *General Counsel*
PETER SUNG OHR
        *Deputy General Counsel*
RUTH E. BURDICK
        *Deputy Associate General Counsel*
DAVID HABENSTREIT
        *Assistant General Counsel*

National Labor Relations Board
June 2023

# Addendum

## STATUTORY AND REGULATORY ADDENDUM
## TABLE OF CONTENTS

29 U.S.C. § 157 ................................................................................. Addendum 2

29 U.S.C. § 158(a)(1) ...................................................................... Addendum 2

29 U.S.C. § 158(a)(5) ...................................................................... Addendum 2

29 U.S.C. § 159(c) ............................................................................ Addendum 2

29 U.S.C. § 159(d) ........................................................................... Addendum 4

29 U.S.C. § 160(a) ........................................................................... Addendum 4

29 U.S.C. § 160(e) ........................................................................... Addendum 4

29 U.S.C. § 160(f) ............................................................................ Addendum 5

29 C.F.R. § 102.62(e) ..................................................................... Addendum 6

29 C.F.R. § 102.65(e)(1)-(2) .......................................................... Addendum 6

29 C.F.R. § 102.67(k) ..................................................................... Addendum 7

**Relevant Provisions of the National Labor Relations Act,
29 U.S.C. §§ 151-69:**

**Sec. 7 [Sec. 157]**  Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) [section 158(a)(3) of this title].

\*\*\*

**Sec. 8(a) [Sec. 158(a)]** [Unfair labor practices by employer]  It shall be an unfair labor practice for an employer--

**(1)**  to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

\*\*\*

**(5**)  to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [section 159(a) of this title].

\*\*\*

**Sec. 9(c) [Sec. 159(c)]**  [Hearings on questions affecting commerce; rules and regulations]

**(1)** Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--

   **(A)**  by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in section 9(a) [subsection (a) of this section], or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is

Addendum 2

no longer a representative as defined in section 9(a) [subsection (a) of this section]; or

  **(B)** by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a) [subsection (a) of this section]; the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

**(2)** In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 10(c) [section 160(c) of this title].

**(3)** No election shall be directed in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act [subchapter] in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

**(4)** Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

**(5)** In determining whether a unit is appropriate for the purposes specified in subsection (b) [of this section] the extent to which the employees have organized shall not be controlling.

***

Addendum 3

**Sec. 9(d) [Sec. 159(d)]** [Petition for enforcement or review; transcript]  Whenever an order of the Board made pursuant to section 10(c) [section 160(c) of this title] is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under section 10(e) or 10(f) [subsection (e) or (f) of section 160 of this title], and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

***

**Sec. 10 [Sec. 160]**

**(a)** [Powers of Board generally]  The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [section 158 of this title]) affecting commerce.  This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominately local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act [subchapter] or has received a construction inconsistent therewith.

***

**(e)** [Petition to court for enforcement of order; proceedings; review of judgment] The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceeding, as provided in section 2112 of title 28, United States Code [section 2112 of title 28]. Upon the filing of such petition, the court shall cause notice

Addendum 4

thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to question of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

**(f)** [Review of final order of Board on petition to court]  Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28, United States Code [section 2112 of title 28]. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to

Addendum 5

the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

**Relevant Provisions of the National Labor Relations Board's**
**Rules and Regulations**
**29 C.F.R. §§ 101-103**

**§ 102.62**  Election agreements; voter list; Notice of Election.

\*\*\*

**(e)** [Notice of Election.]  Upon approval of the election agreement pursuant to paragraph (a) or (b) of this section or with the direction of election pursuant to paragraph (c) of this section, the Regional Director shall promptly transmit the Board's Notice of Election to the parties and their designated representatives by email, facsimile, or by overnight mail (if neither an email address nor facsimile number was provided). The employer shall post and distribute the Notice of Election in accordance with § 102.67(k). The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). A party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

\*\*\*

**§ 102.65**  Motions; intervention; appeals of Hearing Officer's rulings.

\*\*\*

**(e)**

    **(1)**  A party to a proceeding may, because of extraordinary circumstances, move after the close of the hearing for reopening of the record, or move after the decision or report for reconsideration, for rehearing, or to reopen the record, but no such motion shall stay the time for filing a request for review of a decision or exceptions to a report. No motion for reconsideration, for

Addendum 6

rehearing, or to reopen the record will be entertained by the Board or by any Regional Director or Hearing Officer with respect to any matter which could have been but was not raised pursuant to any other section of these Rules except that the Regional Director may treat a request for review of a decision or exceptions to a report as a motion for reconsideration. A motion for reconsideration shall state with particularity the material error claimed and with respect to any finding of material fact shall specify the page of the record relied on for the motion. A motion for rehearing or to reopen the record shall specify briefly the error alleged to require a rehearing or hearing de novo, the prejudice to the movant alleged to result from such error, the additional evidence sought to be adduced, why it was not presented previously, and what result it would require if adduced and credited. Only newly discovered evidence—evidence which has become available only since the close of the hearing—or evidence which the Regional Director or the Board believes should have been taken at the hearing will be taken at any further hearing.

**(2)**  Any motion for reconsideration or for rehearing pursuant to paragraph (e)(1) of this section shall be filed within 10 business days, or such further period as may be allowed, after the service of the decision or report. Any request for an extension of time to file such a motion shall be served promptly on the other parties. A motion to reopen the record shall be filed promptly on discovery of the evidence sought to be adduced.

\*\*\*

**§ 102.67**  Proceedings before the Regional Director; further hearing; action by the Regional Director; appeals from actions of the Regional Director; statement in opposition; requests for extraordinary relief; Notice of Election; voter list.

\*\*\*

**(k)**  [Notice of Election.] The employer shall post copies of the Board's Notice of Election in conspicuous places, including all places where notices to employees in the unit are customarily posted, at least 3 full working days prior to 12:01 a.m. of the day of the election and shall also distribute it electronically to all eligible voters (including individuals permitted to vote subject to challenge) if the employer customarily communicates with employees in the unit electronically. In elections involving mail ballots, the election shall be deemed to have commenced the day the ballots are deposited by the Regional Office in the mail. In all cases, the notices shall

remain posted until the end of the election. For the purposes of this subpart, the term working day shall mean an entire 24-hour period excluding Saturdays, Sundays, and holidays. The employer's failure properly to post or distribute the election notices as required herein shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). A party shall be estopped from objecting to the nonposting of notices if it is responsible for the nonposting, and likewise shall be estopped from objecting to the nondistribution of notices if it is responsible for the nondistribution.

\*\*\*

Addendum 8

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |  |
|---|---|---|
| GHG MANAGEMENT, LLC, d/b/a WINDY CITY CANNABIS, d/b/a CURALEAF WEED STREET | ) ) ) ) | Case Nos. 22-1312, 23-1015 |
| Petitioner/Cross-Respondent | ) ) | |
| v. | ) ) | Board Case No. |
| NATIONAL LABOR RELATIONS BOARD | ) ) | 13-CA-295623 |
| Respondent/Cross-Petitioner | ) ) | |

_____

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its motion contains 12,659 words of proportionally spaced, 14-point

type, and the word processing system used was Microsoft Word for Windows 365.


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960


Dated at Washington, DC
this 20th day of June 2023

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| _____ ) | |
| GHG MANAGEMENT, LLC, d/b/a WINDY CITY ) | |
| CANNABIS, d/b/a CURALEAF WEED STREET ) | Case Nos. |
| ) | 22-1312, 23-1015 |
| Petitioner/Cross-Respondent ) | |
| ) | |
| v. ) | |
| ) | Board Case No. |
| NATIONAL LABOR RELATIONS BOARD ) | 13-CA-295623 |
| ) | |
| Respondent/Cross-Petitioner ) | |
| _____ ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 20th day of June 2023